29 P.3d 1275 (2001)
In re the DEPENDENCY OF T.R.,
State of Washington, Department of Social and Health Services, Respondent,
v.
Velma Rhyne, Appellant.
No. 46767-1-I.
Court of Appeals of Washington, Division 1.
August 27, 2001.
*1278 Oliver Davis, Washington Appellate Project, Seattle, for Appellant.
Catherine Cruikshank, Assistant Attorney General, Seattle, for Respondent.
Lori Larcom Irwin, Seattle, Guardian Ad Litem. *1276
*1277 ELLINGTON, J.
In proceedings to terminate parental rights, the trial court made the statutory findings required for termination but determined a guardianship, rather than termination, was in the best interests of the child. Some 14 months later, after the guardianship proved impossible, the court ordered termination. Although the court held no additional evidentiary hearing before ordering termination, due process was satisfied under the circumstances here. Substantial evidence supports the court's findings, and we affirm.

BACKGROUND
When Velma Rhyne's third child, T.R., was born in February, 1993, both mother and child tested positive for cocaine. T.R. was immediately placed in foster care, and dependency was established in May 1993.[1] Although T.R. has never lived with her mother, there is no question of Ms. Rhyne's love and affection for T.R.
Between the age of six months and six years, T.R. resided in foster care with Cassandra Clemons. T.R.'s older sister also resided there, and Clemons became the older sister's guardian. T.R.'s younger brother lived with Ms. Rhyne until January 2000, when he was removed from her home by the Department of Social and Health Services (DSHS). Ms. Rhyne's parental rights as to T.R. were terminated in May 2000.

DISCUSSION

Procedural Due Process Implications of 14-Month Delay
Because termination of parental rights must be predicated upon current parental unfitness,[2] and the termination order was entered 14 months after the fact-finding hearing without another evidentiary hearing, Ms. Rhyne argues the termination violated her procedural due process rights.[3]
Freedom of personal choice in matters of family life is a fundamental liberty interest protected by the due process clause *1279 of the Fourteenth Amendment.[4] This interest is not diminished just because the State has temporary custody of a child: "If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs."[5] On the other hand, a child has the right to basic nurturing, which includes the right to a safe, stable, and permanent home and the speedy resolution of dependency and termination proceedings.[6] When the rights of a child conflict with the rights of a parent, the rights of the child prevail.[7]
The process due to parents at risk of deprivation of parental rights is determined by balancing the three factors enumerated by the United States Supreme Court in Mathews v. Eldridge: (1) the private interest affected by the proceeding; (2) the risk of erroneous deprivation of such interest through the procedures used, and the probable value of additional or substitute procedural safeguards; and (3) the State's interest.[8]
The procedure here was as follows. Trial on the petition for termination of Ms. Rhyne's parental rights took place over three days in March 1999. The court orally ruled that the six statutory factors were proven by clear, cogent, and convincing evidence, and that the seventh factorthe best interests of the childwas also proven by the applicable standard. But the judge reserved the right to consider a guardianship instead of termination if guardianship was a legally available option: "I'm finding that a termination order would be appropriate in this case unless the Court decides that a guardianship is appropriate under the law as I understand it to be."[9]
A week later, the judge issued a memorandum decision in which he reiterated that the six statutory elements were proved by clear, cogent, and convincing evidence. He then stated, "[I]t is clear, absent guardianship as an alternative, the best interests of the child would be for a termination rather than a continuation of parental rights."[10] The judge found that three circumstances favored guardianship: overwhelming evidence that continued contact with her mother would benefit T.R.; the fact that T.R.'s sister resided in the proposed guardianship home as a ward of the same guardian; and the fact that the potential adoptive mother was willing to cooperate in a guardianship rather than an adoption. Specifically because of these three circumstances, the court concluded that guardianship rather than termination was in T.R.'s best interests.
For the next 12 months, DSHS attempted to implement the court's decision and establish a guardianship for T.R., first with the proposed guardian, Cassandra Clemons, and when that proved impossible, with T.R.'s aunt. These efforts proved unsuccessful, and T.R. was placed in a new foster home. Because the new foster home appeared to be a positive adoptive resource, the State asked the court to finalize termination of Ms. Rhyne's parental rights. The State informed the court that the "mother's inability to care for [T.R.] has since been reviewed and reaffirmed by the Juvenile Court in review hearings. Additionally, the mother's situation has deteriorated over the last year. There have been reports of strange behavior by the mother, which appears indicative of mentally [sic] illness."[11]
Counsel for Ms. Rhyne filed a written response, arguing her rights should not be terminated without a resumption of trial, and *1280 alleging that she had continued to receive services and that her relationship with T.R. had improved dramatically. Counsel also informed the court, however, that Ms. Rhyne had lost her housing and moved into a friend's house with her son, and that her son had been removed from her custody "primarily because of [his] behavior."[12] Counsel asserted Ms. Rhyne was "ready to resume custody of [her son], and to care for T.R. as soon as she gets more permanent housing."[13]
The guardian ad litem submitted a report[14] and testified at the hearing to the effect that T.R. liked living with her new foster parent, where she received one-on-one attention, and that T.R.'s school attendance and behavior had been good. The guardian ad litem expressed her hope that "the placement would be one this time that she can stay and become a mature woman."[15] Ms. Rhyne did not attend the hearing, although the record contains declarations from her friends attesting to her qualities as a parent.
At the hearing, counsel for Ms. Rhyne argued:
[S]ince we were last here there has been a tremendous change in terms of what has occurred.
The mother has continued her treatment, she has additional home base[d] services. She ... has been in a group counseling at Central Area Mental Health. The girls were removed from the foster mother ... I think around December and then they.... were with the aunt an extended period of time and the aunt lived in the neighborhood of Ms. Rhyne and the children and [T.R.] visited regularly and on some weeks it was almost daily, she did develop a relationship with her mother.
The other child ... ran away and she is currently on the run, her whereabouts are not known. She did notshe went back to a foster home and then left.
I think that the due process considerations would require us to determine whether or not the same findings really would still hold because enough time has gone by and there's been a change of many different things that have occurred since that time.[16]
The court disagreed: "I have made my findings and there is no law that I'm aware of, due process, constitutional or otherwise, that requires the Court to revisit Findings of Fact that have previously been made."[17] The court reaffirmed its earlier findings, and characterized the issue as whether to order a new guardianship or revert to termination. Because two of the three factors warranting guardianship were no longer present and the thirdthe likely benefit to T.R. from contact with her motherwas overcome in the court's view by the passage of time and T.R.'s need for stability, the court ordered termination.
We examine the Mathews factors in light of this history.
1. Private Interest
Ms. Rhyne's interest in the companionship, care, custody, and management of T.R. is "commanding" and "more precious than any property right."[18] This interest "`undeniably warrants deference and, absent a powerful countervailing interest, protection.'"[19] Ms. Rhyne also has an interest in an accurate and just decision.[20]
2. Risk of Erroneous Deprivation
The second Mathews factor requires us to determine whether Ms. Rhyne was erroneously deprived of her parental rights because *1281 of the delay between the termination fact-finding hearing and entry of a final order terminating those rights. Termination of parental rights can be ordered only after the statutory factors are proved by the required standard of proof at a fact-finding hearing in which the parent is afforded the right to be represented by counsel, to introduce evidence, to be heard, and to examine witnesses.[21]
Ms. Rhyne does not dispute that such a hearing occurred, with all findings adverse to her. Rather, she contends the effect of those findings was nullified by the 14-month delay between the fact-finding hearing and the termination order, because termination must be predicated upon current parental unfitness.[22] But the statute does not require that termination orders be entered within a specified period after the fact-finding hearing, and the trial evidence does not evaporate with the passage of time. Whether delay requires reopening the evidence on the issue of current unfitness is an inquiry into what (if anything) has meaningfully changed. Here, therefore, the risk of erroneous deprivation depends upon the likelihood that parental deficiencies established at trial had been remedied.
Testimony at trial indicated that an additional year of services could possibly remedy some of Ms. Rhyne's parental deficiencies. More than a year had passed, during which she allegedly continued to receive services. But there was nothing to indicate a positive change had occurred. Ms. Rhyne alleged she had continued to receive counseling and to visit her daughter. Assuming that to be true, the undisputed facts before the court were that in the intervening year, several hearings occurred in which Ms. Rhyne was determined still unfit to parent T.R., she lost her permanent housing, and her son was removed from her custody. Ms. Rhyne suggested no fact tending to indicate that her parental deficiencies had been remedied such that reunification was possible in the near future. Allegations of continued services and an "improved" relationship with T.R. were not, standing alone, enough to counter the deficiencies found by the court, and the other undisputed information entirely contradicted any likelihood of early reunification. There is thus no likelihood that Ms. Rhyne was erroneously deprived of her parental rights.
3. State's Interests
The State has two interests at stake in a termination proceeding: a parens patriae interest and a fiscal and administrative interest.[23] The parens patriae interest is in preserving and promoting the welfare of the child.[24] This interest is "urgent" and its goal is to provide the child with a safe, stable, and permanent home and a speedy resolution of any dependency and termination proceedings.[25] "The State registers no gain towards its declared goals when it separates children from the custody of fit parents."[26] The State also has a fiscal and administrative interest in reducing the cost and burden of such proceedings,[27] but a purely pecuniary motivation for denying an additional fact-finding hearing in a termination case does violence to the substantial private interest here.
ConclusionMathews Factors
Our balancing of the Mathews factors establishes that while an additional evidentiary hearing would have been preferable, its absence was not a violation of due process under the circumstances here.
Ms. Rhyne advocates a bright-line rule to the effect that delay automatically *1282 requires resumption of trial when entry of a final termination order is postponed. We reject such a rule. Whether a further hearing is required depends upon the facts and circumstances of each case. If circumstances indicate any reasonable possibility that in the interim, parental deficiencies have been corrected so that reunification is possible in the near future, the court should reopen the proceedings. This fully comports with due process: "[F]undamental fairness may be maintained in parental rights termination proceedings even when some procedures are mandated only on a case-by-case basis, rather than through rules of general application."[28] Here, there were no circumstances indicating any such possibility; rather, all indications were to the contrary. Due process therefore did not require reopening the evidentiary proceedings

Sufficiency of Evidence
Parental rights may be terminated only if the State proves certain statutory allegations by clear, cogent, and convincing evidence, and proves by a preponderance of the evidence that termination is in the best interests of the child.[29] If substantial evidence supports the trial court's findings in light of the degree of proof required, an order terminating parental rights must be affirmed.[30] An appellate court will not weigh the evidence or the credibility of witnesses.[31] The dominant consideration is the moral, intellectual, and material welfare of the child.[32]
Ms. Rhyne argues DSHS failed to prove three of the required allegations by clear, cogent, and convincing evidence.
1. Provision of Services
The State must prove that it has offered or provided "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future."[33] The services offered must be tailored to each individual's needs.[34]
Ms. Rhyne argues that the trial court's description of her deficiencies was insufficient to justify deprivation, and that there was no evidence of parental unfitness. The trial court found Ms. Rhyne disorganized and lacking in insight, that her level of functioning had only minimally improved, that it was all she could do to parent her son, and that caring for two children would be overwhelming. These findings were based on Ms. Rhyne's history of substance abuse and on evidence of numerous other problems, including that she was "psychologically unstable,"[35] was confused or disoriented, missed appointments with counselors and her daughters, often forgot to meet her son at the Childhaven van that drove him home (including during trial), left her infant son unattended in her apartment with the door open while she fell asleep at a neighbor's house, and maintained a cluttered and unsanitary home to the point of concern about the safety of her child.
The trial court found the services offered or provided were all the necessary and available services that could correct Ms. Rhyne's deficiencies, and that there were no services that could change her situation in the foreseeable future:
1.10 There are no services which will or can change this situation in the foreseeable future. There are services which might address the mother's deficiencies as they relate to her ability to parent [her son], such as additional time with Mae *1283 Scott, the home-based services counselor. But if successful, those services at most could be expected to correct the deficiencies sufficient to allow the mother to parent one child, not two.
1.11 Services ordered under RCW 13.34.130 have been expressly and understandably offered or provided and all necessary services reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided to this mother.[36]
It is undisputed that Ms. Rhyne received the following services: drug evaluation and in-patient and out-patient treatment, psychological evaluations and mental health counseling, parenting classes, therapeutic child care for her son including transportation, in-home counseling, home support services, assistance with visitation, and a public health nurse. Because family therapy was recommended but never provided, however, Ms. Rhyne argues that not all necessary services were offered.
Dr. Arthur Davis, a clinical psychologist who conducted a psychological evaluation of Ms. Rhyne in 1995, recommended family therapy "because if the children were going to be reunited, there was going to be an adjustment on everybody's part and I thought that professional supervision would prevent another CPS referral."[37] His recommendation "was contingent upon the State's plan to return the children."[38]
Ms. Rhyne does not explain how family counseling could correct her parental deficiencies, or point to any evidence that it would do so. The only testimony about the benefits of family counseling was from the social worker who provided home-based services to Ms. Rhyne and her son. She testified that she "strongly encourage[s] family counseling" and that such counseling "would bring the family closer together."[39]
The objective of family counseling was to facilitate the successful reunification of the siblings as a family. Unfortunately, this was never more than a theoretical possibility. Ms. Rhyne's deficiencies included a low level of functioning, disorganization, lack of insight, and the inability to care for one child, let alone two ("The responsibility of caring for two children would be overwhelming for the mother."[40]) The evidence does not indicate that family counseling would have improved Ms. Rhyne's ability to function as a parent.
Ms. Rhyne also argues the State did not meet its burden because the services provided lacked the long-term continuity Ms. Rhyne needed to master parenting skills. We disagree. When a parent is unwilling or unable to make use of the services provided, DSHS is not required to offer still other services that might have been helpful.[41]
Ms. Rhyne also relies on In re Dependency of H.W.[42] for the proposition that failure to provide particularized services to improve parental fitness (in her case, longer, uninterrupted provision of services) requires reversal of a termination order. But H.W. does not stand for such a broad proposition. In that case, DSHS failed to refer the developmentally disabled mother to its Division of Developmental Disabilities where potentially helpful services were available. The mother was diligent and motivated, but was hampered by a concrete learning style that required appropriate teaching methods; DSHS had apparently assumed she lacked the ability to acquire and apply the information she needed. We held DSHS had failed to prove it had provided all necessary services likely to correct parental deficiencies.[43]
*1284 In contrast, Ms. Rhyne makes no argument that a particularly helpful service was not provided. Rather, she argues she needs a longer period of services. Several witnesses testified that Ms. Rhyne would have benefited from a longer period of uninterrupted services, and that if the services were more consistent, they might have had an impact. But the statute requires the State to prove only that it provided the services that were necessary, available, and capable of correcting parental deficiencies within the foreseeable future. For more than six years, the State provided various services to assist Ms. Rhyne, several of which were extended beyond their usual period. Despite this, her attendance was intermittent and her progress minimal. T.R.'s caseworker testified that Ms. Rhyne needs lifetime services, but DSHS "is not set up to provide lifetime services" to parents.[44]
Finally, even where the State inexcusably fails to offer a service to a willing parent, which is not the case here, termination is appropriate if the service would not have remedied the parent's deficiencies in the foreseeable future, which depends on the age of the child.[45] T.R. was six years old at the time of trial and had been in foster care all her life. To wait another year, or longer, is to wait well beyond T.R.'s foreseeable future.
Substantial evidence supports the finding that the State proved by clear, cogent, and convincing evidence that all necessary and reasonably available services capable of correcting Ms. Rhyne's parenting deficiencies in the foreseeable future were offered or provided.
2. Likelihood that Conditions Would be Remedied
The fifth factor is that "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future."[46] The focus of this factor is "whether parental deficiencies have been corrected."[47] If all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future are offered or provided, and the parental deficiencies are not substantially improved within 12 months of the dependency order, a rebuttable presumption arises that this factor is established.[48]
Ms. Rhyne assigns error to the following finding:
1.12 There is little likelihood that conditions would be remedied such that the child could be placed with the mother within the near future. [T.R.] has resided out of the mother's custody for her entire life. The near or foreseeable future through her eyes does not begin to encompass the time period which would be required for the mother to successfully address her parental deficiencies, even assuming additional or ongoing services were available.[49]
Despite numerous services over several years, Ms. Rhyne still did not possess the necessary skills to parent T.R. Several caseworkers testified that at least an additional year of services was necessary before reunification, and that Ms. Rhyne would be "overwhelmed" if a first or second grader were placed in her custody in March 1999. The evidence established that little likelihood existed that Ms. Rhyne could acquire adequate skills in a future "near" enough for six-year-old T.R.[50] Substantial evidence supports the finding.
3. Effect of Continuing Relationship on Prospects for Early Integration
The sixth factor that the State must prove is that "continuation of the parent *1285 and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home."[51] This finding "necessarily follows from an adequate showing" that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future.[52] Ms. Rhyne argues, however, that reunification was "essentially possible or imminent" and therefore this element was not proven.[53] As previously discussed, however, reunification was by no means imminent, and what is perhaps eventually possible for the parent must yield to the child's present need for stability and permanence. When the entire six-year lifetime of a child has passed without a foreseeable reunification, theoretical possibilities are not enough. Substantial evidence supports the court's determination that it was highly probable that continuation of the parent-child relationship clearly diminishes T.R.'s prospects for early integration into a stable and permanent home.
Child's Best Interests
If the factors in RCW 13.34.180 are proven by clear, cogent, and convincing evidence, the trial court considers whether the State proved by a preponderance of the evidence that termination of the parent-child relationship is in the child's best interests.[54] Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is "fully justified" in finding termination in the child's best interests rather than "leaving [the child] in the limbo of foster care for an indefinite period while [the parent] sought to rehabilitate himself."[55] Ms. Rhyne argues, however, that because the statutory factors discussed above were not proved, the trial court's finding that termination is in T.R.'s best interests cannot stand. Because we hold the State proved the factors in RCW 13.34.180 by clear, cogent, and convincing evidence, we affirm the trial court's ruling that termination is in T.R.'s best interests.

CONCLUSION
Due process was not violated here, and substantial evidence supported the trial court's termination findings. We affirm.
KENNEDY, J., and COX, J., concur.
NOTES
[1] T.R.'s father's parental rights were terminated in October 1998.
[2] In re Welfare of H.S., 94 Wash.App. 511, 523, 973 P.2d 474 (1999), cert. denied, 529 U.S. 1108, 120 S.Ct. 1960, 146 L.Ed.2d 792 (2000).
[3] Ms. Rhyne assigns error to the trial court's finding that she received notice of the termination proceedings. She makes no argument on this issue, however, and it appears completely unfounded.
[4] Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
[5] Santosky, 455 U.S. at 753, 102 S.Ct. 1388.
[6] RCW 13.34.020.
[7] RCW 13.34.020; In re Dependency of K.R., 128 Wash.2d 129, 146, 904 P.2d 1132 (1995).
[8] 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). See Santosky, 455 U.S. at 754, 102 S.Ct. 1388; see also In re Matter of H.J.P., 114 Wash.2d 522, 527, 789 P.2d 96 (1990).
[9] Report of Proceedings (RP) (Mar. 18, 1999) at 111.
[10] Clerk's Papers at 139.
[11] Clerk's Papers at 161. The basis for these allegations is not known, but was not disputed.
[12] Clerk's Papers at 174.
[13] Clerk's Papers at 174.
[14] The guardian ad litem's April 28, 2000 report is not in the record.
[15] RP (May 3, 1999) at 9.
[16] RP (May 3, 1999) at 10-11.
[17] RP (May 3, 1999) at 13.
[18] Santosky, 455 U.S. at 758-59, 102 S.Ct. 1388.
[19] Lassiter v. Dep't of Soc. Servs. of Durham County, NC, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)).
[20] Lassiter, 452 U.S. at 28, 101 S.Ct. 2153.
[21] See RCW 13.34.090(1), .180(4).
[22] See In re Welfare of H.S., 94 Wash.App. 511, 523, 973 P.2d 474 (1999), cert. denied, 529 U.S. 1108, 120 S.Ct. 1960, 146 L.Ed.2d 792 (2000).
[23] Santosky, 455 U.S. at 766, 102 S.Ct. 1388.
[24] Santosky, 455 U.S. at 766, 102 S.Ct. 1388; RCW 13.34.020 ("the legislature declares that the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized").
[25] Santosky, 455 U.S. at 766, 102 S.Ct. 1388; RCW 13.34.020.
[26] Santosky, 455 U.S. at 767, 102 S.Ct. 1388.
[27] Santosky, 455 U.S. at 766, 102 S.Ct. 1388; Lassiter, 452 U.S. at 28, 101 S.Ct. 2153.
[28] Santosky, 455 U.S. at 757, 102 S.Ct. 1388; see also Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (due process is "flexible and calls for such procedural protections as the particular situation demands").
[29] RCW 13.34.190(1)(a), (2); In re Dependency of J.C., 130 Wash.2d 418, 427, 924 P.2d 21 (1996); In re Dependency of H.W., 92 Wash.App. 420, 425, 961 P.2d 963, 969 P.2d 1082 (1998).
[30] H.W., 92 Wash.App. at 425, 961 P.2d 963, 969 P.2d 1082.
[31] In re Sego, 82 Wash.2d 736, 739-40, 513 P.2d 831 (1973).
[32] In re Dependency of J.W., 90 Wash.App. 417, 427, 953 P.2d 104 (1998).
[33] RCW 13.34.180(1)(d).
[34] In re P.D., 58 Wash.App. 18, 29, 792 P.2d 159 (1990).
[35] RP (Mar. 18, 1999) at 16.
[36] Clerk's Papers at 178-79.
[37] RP (Mar. 18, 1999) at 21.
[38] RP (Mar. 18, 1999) at 21.
[39] RP (Mar. 17, 1999) at 83.
[40] Clerk's Papers at 179.
[41] In re Ramquist, 52 Wash.App. 854, 861, 765 P.2d 30 (1988).
[42] 92 Wash.App. 420, 961 P.2d 963, 969 P.2d 1082 (1998).
[43] H.W., 92 Wash.App. at 429, 961 P.2d 963, 969 P.2d 1082.
[44] RP (Mar. 17, 1999) at 176.
[45] See In re Welfare of Hall, 99 Wash.2d 842, 850-51, 664 P.2d 1245 (1983) (where State failed to provide parenting training to willing parent, termination nonetheless affirmed where evidence showed parent could not overcome deficiencies within foreseeable future).
[46] RCW 13.34.180(1)(e).
[47] In re Dependency of K.R., 128 Wash.2d 129, 144, 904 P.2d 1132 (1995).
[48] RCW 13.34.180(1)(e).
[49] Clerk's Papers at 179.
[50] See In re Dependency of A.W., 53 Wash.App. 22, 765 P.2d 307 (1988).
[51] RCW 13.34.180(1)(f).
[52] In re Dependency of J.C., 130 Wash.2d 418, 427, 924 P.2d 21 (1996).
[53] App. Br. at 46.
[54] RCW 13.34.190(1), (2); H.W., 92 Wash.App. at 425, 961 P.2d 963, 969 P.2d 1082.
[55] A.W., 53 Wash.App. at 33, 765 P.2d 307.