[Nos. 21878-3-III; 21879-1-III;    Division Three.    June 8, 2004.]
21880-5-III; 21928-3-III;
21929-1-III; 21930-5-III.

*In the Matter of the Welfare of* SHANTAY C.J., ET AL.

*Cynthia A. Jordan* and *Susan M. Gasch*, for appellants.

*Christine O. Gregoire, Attorney General*, and *Rebecca L. Prahl, Deputy*, for respondent.

KURTZ, J. — In this consolidated appeal, Dawn K. and Mark J. appeal superior court orders terminating their parental rights to their three minor children. The termination trial took place in September 2002, but was continued until January 21, 2003, so that the parents could participate in additional services. The termination orders were entered, without an additional fact-finding hearing, after the court granted the State's motion to strike the continuance in December. We address the procedural due process issues raised by the court's failure to take additional evidence before entering the termination orders. Because we conclude the court was required to take additional evidence before entering each order of termination, we reverse the orders of termination and remand for rehearing.

## FACTS

Mark J. and Dawn K. are the parents of three children: Shantay C.J. born March 21, 1996, and twins, Isaac and Mark C.J. born February 24, 1998. Dawn and her three children were staying in a house where chemicals used in the manufacture of methamphetamine were stored. In July 2001, this illegal activity caused a house fire. When fire fighters arrived at the house, Dawn's boyfriend fled out the back door with three-year-old Mark. Neither Dawn nor the other two children were in the house at the time of the fire. After the fire, the three children were eventually placed by Child Protective Services with their paternal grandmother.

In July 2001, the Department of Social and Health Services (DSHS) filed dependency petitions as to all three

children. The disposition orders required Dawn to complete a drug/alcohol evaluation, psychological evaluation, UA/BA (urinalysis/breathanalysis) monitoring, and therapeutic daycare. A separate order required Mark to complete the same services, and, in addition, he was required to complete domestic violence counseling.

Six months into the dependencies, DSHS filed motions to terminate parental rights based upon allegations that the parents had failed to make sufficient progress. A trial was held in 2002. Both parents received numerous services and evaluations during the dependencies.

*Psychological Evaluations.* Paul Wert, Ph.D., conducted psychological evaluations of both parents. After meeting with Mark, Dr. Wert made an Axis I diagnosis of amphetamine and cannabis dependence. Under Axis II, Mark was diagnosed with a personality disorder not otherwise specified with antisocial, paranoid, and histrionic features. Dr. Wert felt that Mark's underlying personality disorder would make it difficult for him to abstain from using addictive substances. Dr. Wert found that Mark's "primary challenge was to become involved in some type of inpatient chemical dependency treatment program" and recommended that he complete such a program as well as a domestic violence perpetrator program. Report of Proceedings (RP) at 26. Dr. Wert opined that Mark was not capable of caring for any of his children at the time of his evaluation due to his ongoing drug use.

Dawn was not evaluated by Dr. Wert until July 2002, almost one year after the court ordered that both parents undergo evaluations. Dr. Wert met with Dawn while she was incarcerated in the Spokane County Jail. In his evaluation, Dr. Wert made an Axis I diagnosis of amphetamine or amphetamine-like substance dependency, alcohol abuse, and cannabis abuse. He also diagnosed Dawn with an antisocial personality disorder. Dr. Wert concluded that at the time of the evaluation, Dawn lacked the emotional and psychological stability to provide consistent and safe parenting for her children.

*Chemical Dependency Evaluation and Treatment.* Because chemical dependency problems were the primary problem for the parents, they received chemical dependency evaluations at North East Washington Treatment Alternatives.

Mark received a diagnostic chemical dependency evaluation on September 25, 2001. He was diagnosed with severe amphetamine dependence. The evaluation recommended a clinically-monitored treatment program with UAs. He entered into the treatment program on September 12, 2001, but was discharged for noncompliance on October 26, 2001. He was readmitted in March 2002 and tested positive for marijuana on 13 occasions between April 15 and June 19, 2002. On July 2, 2002, Mark entered and eventually completed an inpatient treatment program at Thunderbird Treatment Center. Alvin Currie, his counselor at the treatment center, testified that Mark was a "model patient," characterizing him as straightforward and honest, and an active participant in the group sessions. RP at 453. Mr. Currie concluded that Mark had a high chance of maintaining his recovery. Mark was successfully discharged from the inpatient portion of the program on August 30, 2002. He then entered the outpatient portion of the program which he completed on December 1, 2002. After his participation in the inpatient program, and after the September trial, Mark had negative UAs in October, November, and December 2002.

Dawn was diagnosed as amphetamine dependent with a guarded prognosis. The chemical dependency counselor recommended outpatient treatment, UA/BA testing, a nonclinical support group, and mental health counseling to address depression issues. In December 2001, Dawn was removed from the program for noncompliance. She was reactivated on January 18, 2002, and subsequently tested positive for marijuana on January 25, 2002, and methamphetamine on March 27. Between October 2001 and February 2002 she had 14 "no shows." RP at 61. On May 30, 2002, she was discharged again for noncompliance.

From the end of May 2002 until the end of July 2002, Dawn was incarcerated for probation violations. At the end of her incarceration, she was readmitted to treatment. In late July, shortly after her release from jail, Dawn tested positive for marijuana use; during the following weeks, she had two subsequent tests that were invalid for low specific gravity. However, in late August 2002, Dawn entered outpatient treatment at YFA Connections. From that point until the September termination trial, Dawn had negative UAs. During cross-examination, counsel for Dawn asked the treatment counselor whether Dawn had made progress. The counselor responded, "I'm very impressed that [Dawn] is willing to address her drug and alcohol use issues in intensive outpatient treatment." RP at 76. The counselor further stated, "There's no doubt in my mind with continued treatment services and structure and openness and honesty on [Dawn's] part that she can attain and maintain some quality recovery." RP at 77.

Between February 2002 and September 2002, Dawn also attended group process meetings at Interim Services at Community Detox Services. These meetings are not considered chemical dependency treatment. Nevertheless, George Robinson, a counselor at the program, testified that Dawn was enthusiastic about recovery: "She shows up for groups. A lot of people who say they are, don't know [sic] up, but she—her actions are what I gauge her recovery on." RP at 313. He concluded that her prognosis for recovery was excellent.

*Visitation.* The parents were also offered weekly supervised visitation with their children. Launi Burdge, the family's social worker, described an early visitation as traumatic for the children because Dawn was obviously upset, but Ms. Burdge also noted that there was a bond between the mother and children. Ms. Burdge further testified that the parents were on a waiting list to get into therapeutic daycare but, due to drug use or incarceration, the parents did not qualify for the program. In June, the court ordered that visitation was suspended until each

parent produced negative UAs. However, even after the parents both produced clean UAs, DSHS suspended visitation because two therapists thought it would be detrimental to the children.

*Trial and Continuance.* On September 18, 2002, after several days of trial, the court made two oral rulings. The court determined that the State had met its burden as to three of the six factors set forth in RCW 13.34.180(1)(a)-(f), by establishing that the court had personal and subject matter jurisdiction, and that the dispositional orders were appropriate and timely. The court then stated that it was taking the matter under advisement regarding any further findings and conclusions. In a memorandum opinion filed on September 26, 2002, the court restated these findings and granted a continuance of the trial until January 20, 2003. The court explained that this continuance was granted "[g]iven the recent efforts of the parents (although belated)" and to give the parents "one last chance to engage in services and make progress." Clerk's Papers (CP) at 24, 107. The continuance was contingent on the parents' continued sobriety and their continued adherence to their substance abuse plans and the services outlined in the dispositional orders.

The contents of the memorandum opinion, and the resulting orders, are of critical importance given the court's failure to address all six of the factors set forth in RCW 13.34.180(1). In granting the continuance, the court stated: "During this period of time, it is my expectation that the mother and father will continue their current substance abuse treatment and engage in those other services outlined in the dispositional order." CP at 25. The court also explained that "it is my intent that the parents remain clean, in treatment and participate fully in UA/BA testing" and that "[Mark] should have a follow up evaluation with Dr. Wert." CP at 25. Finally, the court stated "there will be no need for further trial or testimony on this matter should the parents not maintain sobriety as I previously indicated or should I determine that the parents are not making good

faith effort to comply with the dispositional order as a whole." CP at 25.

On November 22, the court entered orders of continuance of the termination trial. The court ordered that the parents remain in drug/alcohol treatment, maintain sobriety, participate in UA/BA testing, participate in therapeutic visitation after four clean consecutive random UAs, participate in a parent/child assessment, and obtain psychological evaluations from Dr. Wert. Mark was required to complete the domestic violence counseling ordered under the dispositional orders. The court further ordered that if the parents failed to comply, DSHS "shall file a motion to strike the continuance" and "shall then present testimony in order that the Court may make findings as to the issue of whether the parents made a good faith effort to comply, and were able to maintain sobriety." CP at 160. The orders do not contain any findings or conclusions with regard to the factors set forth in RCW 13.34.180(1), but the court's memorandum opinion, which resolved three of the factors, was attached to each of the orders.

*Motion to Strike Continuance.* In a letter dated December 11, 2002, Carol J. Thomas, the children's therapist, reported that she had conducted four family/therapeutic visitation sessions with the children and their mother, and with the children and their father. Ms. Thomas wrote that she had observed significant progress during these sessions. However, the letter went on to report that Dawn had missed the December 10 visitation due to her incarceration and that this had caused extreme distress to her children. Ms. Thomas concluded, "[e]motionally, these children cannot afford this type of inconsistency in parental availability .... I do not believe these children can emotionally tolerate further disappointment by their mother." CP at 40.

On December 12, 2002, the State asked the court to strike the trial continuance due to Dawn's incarceration for probation violations, her subsequent inability to attend outpatient chemical dependency treatment or random UA/BA testing and, most importantly, the severe distress to the

children that resulted from her consequent inability to attend visitation. Additionally, the State informed the court that Mark had failed to provide proof of entry or completion of the domestic violence perpetrator program.

Dawn wrote a letter to the court stating that "although the children might not understand the reasons that I missed the visit, my missing this visit was totally out of my control as I was held without bond." CP at 43. Likewise, Mark wrote to the court pointing out that he had complied with all of the court's orders and had reengaged in domestic violence counseling with Bill Sims on December 4, 2002. Dr. Wert and Mr. Sims verified that Mark had met with them.

*Disposition.* The court held a hearing on the motion for continuance on December 30, 2002. During the hearing, the court again indicated that it had not entered the requisite findings and conclusions after the September trial. Specifically, the court stated, "I just wanted to see more about this case before I make any determination." RP at 566. No testimony was taken at this hearing. When Dawn's counsel asked if her client would be permitted to address the court, the court responded "No, no. This is a legal motion." RP at 567.

The parents moved for reconsideration. Mark argued that the court violated his due process rights by refusing to allow him to present additional evidence, including an updated evaluation by Dr. Wert. Dawn argued that the missed visitation in December was not willful and requested a hearing to allow Ms. Thomas to testify as to whether reunification with the children would still be viable. The court denied the motion for reconsideration.

On February 27, 2003, the trial court entered findings of fact and conclusions of law and orders terminating Dawn's and Mark's parental rights. They appeal.

## ANALYSIS

Our primary concern is whether the parents' due process rights were violated when the court granted the State's

motion to strike the trial continuance and terminated the parents' parental rights without reconvening the trial and allowing the parents the opportunity to present additional evidence.

■ *Standard of Review.* Courts have long recognized that a biological parent has a fundamental liberty interest in the care, custody, and control of his or her child, but that this fundamental right is not absolute. *In re Dependency of A.V.D.*, 62 Wn. App. 562, 567, 815 P.2d 277 (1991). The State also has an obligation to protect the child when the parent's action or inaction endangers a child's physical or emotional welfare. RCW 13.34.020; *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980).

■ RCW 13.34.180(1) governs the termination of parental rights and sets forth six factors the State must allege and prove in a termination hearing:

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .

. . . .

(f) That continuation of the parent and child relationship clearly diminishes that child's prospects for early integration into a stable and permanent home.

A court may enter an order terminating the parent-child relationship when it finds that these six requisite allega-

tions are supported by clear, cogent and convincing evidence. RCW 13.34.190(1); *In re Welfare of Hall*, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983). Additionally, the trial court must also find by a preponderance of the evidence that termination is in the best interests of the child. RCW 13.34.190(2).

■■ Termination of parental rights must be predicated upon current parental unfitness. *In re Welfare of H.S.*, 94 Wn. App. 511, 523, 973 P.2d 474 (1999). "Termination of parental rights can be ordered only after the statutory factors are proved by the required standard of proof at a fact-finding hearing in which the parent is afforded the right to be represented by counsel, to introduce evidence, to be heard, and to examine witnesses." *In re Dependency of T.R.*, 108 Wn. App. 149, 158, 29 P.3d 1275 (2001) (citing RCW 13.34.090(1),[1] .180(4)).

■ In *T.R.*, the court heard evidence and determined that the six statutory factors had been proved by clear, cogent, and convincing evidence and that the best interests of the child factor had also been met; but the court reserved the right to consider a guardianship instead of termination. *T.R.*, 108 Wn. App. at 155. The court ultimately finalized the termination some 14 months later without reopening the issue of current fitness. *Id.* at 157. The appellate court conducted its review by applying the factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). *T.R.*, 108 Wn. App. at 154-55. Under *Mathews*, the process due to parents to ensure protection of their due process rights is determined by balancing three factors: (1) the parent's interest, (2) the risk of error created by the procedure, and (3) the State's interest. *Mathews*, 424 U.S. at 335. Applying this analysis, the *T.R.* court determined that "while an additional evidentiary hearing would have been preferable, its absence was not a violation of due

---

[1] RCW 13.34.090(1) states:

"Any party has a right to be represented by an attorney in all proceedings under this chapter, to introduce evidence, to be heard in his or her own behalf, to examine witnesses, to receive a decision based solely on the evidence adduced at the hearing, and to an unbiased fact-finder."

process under the circumstances here." *T.R.*, 108 Wn. App. at 160.

■ Here, the crux of the problem relates to the second *Mathews* factor, which is the risk of error created by the procedure followed by the court. Before the court could enter orders terminating the parent-child relationships, the court was required to find that all of the six requisite allegations of RCW 13.34.180(1) were proved by clear, cogent, and convincing evidence. Instead, the court expressed its reluctance to enter such findings, granted a continuance, and ordered additional services. Thereafter, the court struck the trial continuance, refused to hold a fact-finding hearing, and entered orders terminating the parent-child relationships—without taking evidence regarding the results of those services.

Because the court did not enter findings after the September 2002 trial—and did not take additional evidence before terminating the parental rights—the standard applied by the court is unclear and unreviewable. Moreover, the record is unclear as to whether the termination orders were entered because the State had met its burden under RCW 13.34.180 or because the State had demonstrated that the parents had failed to comply with the court's conditions for granting the continuance.

Both parents question the fairness of the procedure employed by the court. For example, Dawn points out that she was uncertain whether the State retained the burden to prove the statutory requirements or whether the State merely had to show that she had failed to comply with all the terms and conditions set forth in the order of continuance, including unspecified conditions such as conditions of probation. Similarly, Mark repeatedly asserts that, as directed by the court, he had continued to progress, but that his rights were terminated because of Dawn's failure to attend one therapeutic visitation session.

*In re Dependency of T.R.* is instructive, but distinguishable. There, the trial court concluded that the State had met its burden of proof on all the statutory elements of

RCW 13.34.180. *T.R.*, 108 Wn. App. at 167. Also, the appellate court ultimately concluded that additional fact finding was unnecessary because "there was nothing to indicate a positive change had occurred." *T.R.*, 108 Wn. App. at 159. Here, the trial court was reluctant to make findings with regard to all of the statutory factors and granted a continuance. After granting the continuance, the trial court refused to take any additional evidence regarding positive changes that had occurred during the period of the continuance. In this regard, this case is unlike *T.R.* because there was evidence that some positive changes had occurred.

*Mark.* Mark correctly points out that his main deficiencies were related to his history of drug use and concedes he initially failed to engage in treatment. But he notes that before the termination trial, he successfully completed inpatient and outpatient treatment. Although Mark was somewhat slow in addressing his drug problem, the record shows that from July 2002 until December 2002 he was clean and sober.

Mark also made significant progress in improving his parenting skills. Ms. Thomas, the social worker who conducted the family therapeutic visitation sessions, reported in December 2002 that the parents made significant progress toward reestablishing the parent-child relationships and their ability to parent their children.

Mark also substantially addressed his domestic violence issues. Mr. Sims testified that certified domestic violence agencies in Washington State require 26 weekly meetings followed by 6 monthly meetings. While Mark was initially discharged from the program in 2001 for noncompliance, by 2002 he had attended 24 weekly sessions. Mr. Sims testified that Mark was making progress in the program and characterized his participation as positive. The trial court, however, was dissatisfied with Mark's failure to complete domestic violence counseling.

*Dawn.* Dawn also demonstrated progress in remedying her parental deficiencies. Ms. Thomas's letter regarding Dawn's progress in the therapeutic visitation program

reveals a mother who was closely bonded to her children and who was making great strides in improving her parenting skills. Ms. Thomas wrote that Dawn "appropriately supported and facilitated their work in family therapy." CP at 87. She also wrote:

> [Dawn] supported and facilitated her children's processing of trauma, accurately defining trauma events to them, accepting full responsibility, giving voice to their experiences and feelings, listening empathetically to them and their expression of emotions. She provided them with information regarding herself and treatment, related to prevention of retraumatization.

CP at 88. Despite this progress, the family suffered a setback when Dawn was not allowed to visit her children while she was incarcerated during December 2002. Ms. Thomas's letter to the social worker described the children's responses when they learned their mother would not be coming. Shantay expressed disbelief, looking out the window for her mother for 20 minutes, and then anger. She then experienced sadness and despair, stating " 'My mom hates me.' " CP at 39. Isaac was confused and then depressed, while Mark became withdrawn and then angry.

Dawn argues that the missed visitation was not willful and that the probation violations occurred before the judge granted the continuance.[2] Her argument has considerable merit. Until she was incarcerated, she had been making significant progress in developing her parenting skills. Ms. Thomas's letter supports Dawn's argument that further therapeutic visitation could have increasingly benefited the family and that reunification was possible. Instead, just as the children were beginning to trust their mother, they were denied access to Dawn because she was incarcerated.

Equally problematic, the court's decision to strike the continuance—and then immediately enter the termination orders—resulted in an incomplete record concerning

---

[2] The report of alleged violations stated that Dawn failed to (1) report a change of address, (2) provide verification to her corrections officer that she attended Narcotics Anonymous/Alcoholics Anonymous meetings, and (3) pay court fines. On appeal, she was found not guilty of the first allegation.

Dawn's drug treatment. Evidence introduced at the September trial established that Dawn demonstrated progress in addressing her chemical dependency problems. In August 2002, she entered outpatient treatment at YFA Connections. And between February and September 2002, she attended group process meetings at Interim Services. The counselor noted Dawn's full participation in the sessions and concluded that her prognosis for recovery was excellent. Even the treatment counselor conceded that if Dawn continued in her outpatient services she would "maintain some quality recovery." RP at 77. The trial court showed great concern over the parents' past problems with drug abuse. But we cannot tell whether Dawn remained drug free after the September trial because the court did not hold an additional fact-finding hearing.

In conclusion, we hold that the court was required to take additional evidence and to enter findings of fact before entering the orders of termination. We further hold that the court's failure to allow and consider such evidence deprived the parents of their right to due process. Accordingly, we reverse the orders of termination and remand for rehearing. Evidence from the termination trial is preserved and the scope of the hearing is limited to issues under RCW 13.34.180(1)(d), (e), and (f), and current parental fitness as of the date of the remanded hearing. Because we reverse the orders of termination, we do not address the other issues raised by the parents in this appeal.

SWEENEY, A.C.J., and BROWN, J., concur.