IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of: | No. 83542-4-I |
| B.E.M.B.M.-W., | DIVISION ONE |
| A Minor Child. | UNPUBLISHED OPINION |

ANDRUS, C.J. — G.M. appeals an order terminating her parental rights to her daughter, B.E. She contends the Department of Children, Youth, and Families (Department) failed to establish that termination was in the child's best interest. We affirm the termination order.

FACTS[1]

G.M. has struggled with substance abuse since age 14 and lost parental rights to her first child in November 2000 due, in part, to substance abuse issues. In November 2018, G.M. gave birth to B.E. and admitted to using heroin six days prior to doing so. B.E. tested positive for methadone and opiates at birth. Three weeks later, the Department filed a dependency petition and removed B.E. from the mother's custody due to her substance abuse, lack of parenting skills, and lack of safe stable housing. B.E. has been in out-of-home care ever since.

---

[1] These facts are largely taken from the termination order. G.M. has not assigned error to most of the findings of fact, so we accept them as true. *In re Welfare of A.W.*, 182 Wn.2d 689, 711, 344 P.3d 1186 (2015) (unchallenged findings are verities on appeal).

Citations and pin cites are based on the Westlaw online version of the cited material.

In January 2019, the trial court found B.E. dependent.[2] The court entered a disposition order requiring the mother to complete a drug and alcohol evaluation (along with appropriate in-patient or out-patient treatment recommendations), random urinalysis testing (UAs), evidence-based parenting education, one-on-one parenting coaching, the Parent Child Assistance Program (PCAP), individual counseling, and mental health treatment. Throughout the dependency, the Department consistently referred the mother to these and other services.

A.    Drug and Alcohol Services

The Department referred B.E.'s mother for a drug and alcohol assessment and treatment at Evergreen Recovery Centers (Evergreen Recovery) in December 2018 and July 2019. G.M. completed this assessment in November 2019 and began its residential Parenting and Pregnant Women (PPW) Program. The PPW program is a six-month in-patient substance use program for pregnant and parenting women. Patients live in the facility, attend groups, meet with counselors, attend parenting classes, and engage in substance use treatment and mental health counseling. The facility transports patients to appointments off site if needed.

Alexandra Schmidt, a substance use disorder counselor, testified that she had daily contact with G.M. while in the PPW program. G.M. told Schmidt that she had last used heroin on November 20, 2019, and she wanted to be sober for her baby, but she "had a hard time in the past." While in this program, however, G.M. often went to class late, presented as extremely lethargic during classes and

---

[2] The father's parental rights were terminated in September 2020. He is not a party to this appeal.

appointments, "would often fall asleep" during sessions and treatment groups, and was not engaged in treatment. In December 2019, G.M. was discharged from the PPW program and transferred to the Intensive Outpatient Program (IOP) at Evergreen Recovery.

The IOP program, which the mother began in January 2020, is for patients with a history of substance use and who are unable to maintain sobriety or long-term abstinence on their own. The program included group sessions, individual counseling sessions, and random UAs. Substance use disorder counselor Kathleen Mehl worked with G.M. between April and July 2020. During this time, G.M. was never in compliance with treatment, as she missed multiple group and individual counseling sessions, failed to submit proof of attending at least 22 sober support meetings, and tested positive for fentanyl and alcohol in June 2020. Mehl testified that even though the mother "may have been marked as present, she frequently was not present by the end of group." G.M. presented as lethargic and unengaged in IOP program treatment and was discharged from the program in August 2020 due to lack of engagement and lack of compliance with treatment.

At G.M.'s request, the Department referred her to a third drug and alcohol assessment and treatment at Catholic Community Services in November 2020. Although she started the assessment, she did not complete it. G.M. did not engage in substance abuse treatment with Catholic Community Services or any other agency after Evergreen Recovery discharged her from IOP.

Although G.M. received methadone treatment prior to, and over the entire course of, the dependency, her substance abuse remained ongoing.

B.    Random UA Testing

Compliance with UAs is important to demonstrate long-term sobriety.  The Department offered G.M. at least 30 random UAs throughout the dependency but G.M. completed only 10 of them.

C.    Parenting Education and Coaching Services

In June 2019, the Department referred G.M. to "Incredible Years" and to "Promoting First Relationships."  Incredible Years is a parenting class designed to teach skills for parenting infants.  Promoting First Relationships is an in-home service geared to parents with infants.  G.M. successfully completed Incredible Years in August 2019, but a provider informed the Department that Promoting First Relationships was not appropriate for G.M. because B.E. was not in her mother's care at that time.

In August 2019, the Department referred G.M. to Pioneer Human Service's Family Preservation Services (FPS), a parenting education and one-on-one parenting coaching program designed to equip parents with tools and strategies for appropriate parenting.  Cynthia Morrison, a Pioneer clinician, worked with G.M. for a year.  Morrison also reported that the mother was unengaged and uninterested in the service, and often in what Morrison described as a drug-induced lethargy.  Morrison found G.M. not open to instruction on child development and reported that the mother withheld formula from B.E. because she believed it would curdle in the child's stomach, and refused to believe that B.E. needed glasses, asserting that babies do not need glasses.  Morrison ended the service due to G.M.'s lack of engagement.

The Department referred the mother to FPS with Cheryl Petosa at the Institute for Family Development. The Institute provides a three-month, evidence-based program that helps families reunify with their children and rebuild their bonds and relationship. Petosa worked with G.M. from December 2020 to February 2021. But again, G.M. "timed out" and did not complete this service because she did not fully engage. Petosa testified G.M.'s "ability to follow through with services [was] a challenge."

The Department also offered G.M. a PCAP called "Safe Babies, Safe Moms." This program, a three-year voluntary program geared toward women who struggled with addiction during pregnancy and have children under the age of three, has providers who advocate for and work with parents to help them obtain necessary treatment and services. Shannon Smith, a PCAP provider, worked with G.M. from the beginning of 2020 until March 2021. Smith reported that she helped G.M. attend medical appointments, access housing resources, attend court on one occasion, and access Supplemental Security Income benefits.

D. Counseling and Mental Health Services

Crystal Kraft, the Department social worker assigned to this family, provided G.M. with information to access mental health and counseling services multiple times by text message, over the phone, in many service letters, and in person. The Department referred G.M. for a mental health assessment but she failed to complete the assessment. It offered her individual counseling, available on completion of a mental health assessment, but the mother never engaged in this counseling. The Department also offered G.M. a neuropsychological evaluation

for the purpose of identifying any potential underlying issues and recommending services that might address those issues, but G.M. ignored the offer as well.

E.     Other Services

In addition to court-ordered and necessary services, the Department provided G.M. with bus tickets, an ORCA card, and two computer tablets to assist her with accessing visitation and services, offered her case management services, offered to pay her first month's rent if she obtained housing, and provided her with housing resource information.  G.M. also received housing assistance through the PCAP provider.

G.M. struggled with lethargy throughout the dependency, reporting life-long sleepiness.  Kraft testified G.M. would "kind of nod off, fall asleep during visitations, and so that definitely makes it difficult to be continuously supervising a child at age three."  G.M.'s service providers reported that "she would fall asleep during our conversations," "fall asleep during our sessions and during treatment groups," and "once she even fell asleep standing up."

The Department, the PCAP provider, and G.M.'s YWCA parent ally offered to help G.M. schedule, reschedule, and attend a sleep study appointment.  G.M., however, never completed the sleep study.

All of the services offered to G.M. failed due to her lack of engagement.

F.     Termination Trial

In July 2019, the Department filed a petition to terminate G.M.'s parental rights.  After more than 30 months of attempts to engage G.M. in services, the

court held a two-day termination trial in November 2021. G.M. did not appear at trial, either in person or via Zoom.[3]

At trial, the court admitted 66 exhibits and considered the testimony of seven witnesses. It also considered the opinion of the court appointed special advocate (CASA) Lorraine Voss, who testified that termination was in B.E.'s best interest because of G.M.'s ongoing chemical dependency and unaddressed mental health issues.

On November 8, 2021, the court terminated G.M.'s parental rights as to B.E. The court found the Department had offered and provided all court-ordered and necessary services capable of correcting the mother's parental deficiencies within the foreseeable future. But, despite the Department's efforts, the court found that there was little likelihood that conditions would be remedied so that B.E. could be returned to G.M. in the near future. The court also found that G.M. was currently unfit to parent B.E., that continuation of the parent-child relationship clearly diminished B.E.'s prospects of early integration into a stable and permanent home, and that termination of G.M.'s parental rights was in B.E.'s best interests.

G.M. appeals.

ANALYSIS

G.M.'s sole claim is the trial court erred when it concluded that termination of her parental rights was in B.E.'s best interests. We disagree.

---

[3] The Department social worker testified to receiving a UA on the morning of the first day of trial indicating that G.M. "was still actively using" drugs.

A.      Standard of Review

Parental rights are a fundamental liberty interest protected by the United States Constitution.  *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re Dependency of K.N.J.*, 171 Wn.2d 568, 574, 257 P.3d 522 (2011).  In order to terminate the parent-child relationship, the Department must first prove, by clear, cogent, and convincing evidence, the six elements set forth in RCW 13.34.180(1).  RCW 13.34.190(1)(a).  Due process then requires the trial court to expressly or impliedly find that the parent is currently unfit.[4]  *In re Welfare of A.B.*, 168 Wn.2d 908, 918-19, 232 P.3d 1104 (2010).  If the Department satisfies this burden, the court may order termination if the Department establishes by a preponderance of the evidence that termination is in the child's best interest.  RCW 13.34.190(1)(b); *K.N.J.*, 171 Wn.2d at 577.

On review, we ask only whether the court's findings of fact are supported by substantial evidence and whether those findings support the court's conclusions of law.[5]  *In re Dependency of P.D.*, 58 Wn. App. 18, 25, 792 P.2d 159 (1990).  We defer to the trial court on issues of conflicting testimony, credibility of the witnesses, and the weight or persuasiveness of the evidence.  *In re Welfare of A.W.*, 182 Wn.2d 689, 711, 344 P.3d 1186 (2015).

---

[4] We do not address this burden further because G.M. does not challenge that the Department failed to prove any of the statutory factors or her current unfitness to parent B.E.

[5] "Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise."  *Bering v. SHARE*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986) (citing *In re Snyder*, 85 Wn.2d 182, 185-86, 532 P.2d 278 (1975)).

B.      Child's Best Interests

"The criteria for establishing the best interests of the child are not capable of exact specification because each case is largely dependent upon its own facts and circumstances." *In re Dependency of J.S.*, 111 Wn. App. 796, 804, 46 P.3d 273 (2002).  Due to the individual facts of each case, "the courts have broad discretion and are allowed considerable flexibility to receive and evaluate all relevant evidence in reaching a decision that recognizes both the welfare of the child and parental rights." *In re Welfare of Becker*, 87 Wn.2d 470, 478, 553 P.2d 1339 (1976).  Accordingly, we place a " '*very strong* reliance on trial court determinations of what course of action will be in the best interests of the child.' " *In re Matter of Pawling*, 101 Wn.2d 392, 401, 679 P.2d 916 (1984) (emphasis in original) (quoting *In re Welfare of Todd*, 68 Wn.2d 587, 591, 414 P.2d 605 (1966)).

Here, the court acknowledged that B.E. loved G.M. and enjoyed visits with her mother, that G.M. loved her daughter, and that the two shared a bond.  But the court also found that this connection alone was not enough to prevent termination:

> The mother has not demonstrated that she is anything but a limited, visiting parent.  Despite numerous services offered and provided to assist her to remediate her parental deficiencies, she has not made progress in that remediation and has not demonstrated that she can be a full time parent.
> . . .
> The mother's chemical dependency and chronic health issues, complicated by diabetes, make it difficult for the mother to engage with or keep up with the child.  Overcoming addiction does not happen overnight, but the Department has made reasonable efforts to assist the mother and the mother was given an ample timeframe.

The court determined that B.E. (1) has basic needs of stability, structure, safety, food, and shelter; (2) is developmentally behind and requires a significant

number of medical appointments; (3) requires occupational therapy for fine motor skills due to her developmental delay, which G.M. struggled to attend when invited to do so; and (4) is an active toddler and requires robust physical and recreational engagement. The court ultimately concluded that because G.M. could neither meet her own needs nor meet B.E.'s basic and special needs, termination was in the child's best interests.

G.M. claims that the court made its "best interest" decision "based on an artificial timeline of 8 months and its finding that G.M. could not remedy her substance use issue by then" and its "decision implicitly prioritizing timely legal permanence fails to recognize the negative long-term effects of separation from a parent."[6] But this claim ignores that "[w]here a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo of foster care for an indefinite period' " while the parent attempts rehabilitation. *In re Dependency of T.R.*, 108 Wn. App. 149, 167, 29 P.3d 1275 (2001) (alteration in original) (quoting *In re Dependency of A.W.*, 53 Wn. App. 22, 33, 765 P.2d 307 (1988)).

Moreover, the court did not simply base its determination on an "artificial timeline" in order to reach "legal permanence." Rather, the court clearly considered all the relevant evidence to conclude that G.M. could not meet B.E.'s

---

[6] G.M. also points to several articles and studies, which comprise a large portion of her opening brief, regarding the harm that may result when children are removed from the care of their parents. But these materials were not presented to the trial court and we will not consider them. *See State v. Walker*, 153 Wn. App. 701, 708, 224 P.3d 814 (2009) (appellate court does not take evidence). Even if we considered this material, it is of little value because B.E. spent her entire life out of G.M.'s care.

basic and special needs in the foreseeable future. Where the health and safety of the child conflicts with the rights of the parent, "the rights and safety of the child should prevail." RCW 13.34.020.

G.M. also contends the court's "best interest" determination "failed to even consider the extended family B[.E.] will also lose by termination." But the father's family did not respond to the Department's inquiries for B.E.'s placement and "there was no follow-through" with any of the people whom G.M. asked the Department to contact. Nor does G.M. identify any relatives or extended family members whose relationship with the child will be harmed by the court's termination decision.

The record supports the trial court's finding, by a preponderance of the evidence, that terminating G.M.'s parental rights was in B.E.'s best interests. Accordingly, we affirm the court's termination order.

_Andrus, C.J._

WE CONCUR:

_Birk, J._          _Smith, A.C.J._