# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In re Dependency of: )
)
L.R., a minor child, ) No. 73763-5-I
)
v. )
)
STATE OF WASHINGTON, ) DIVISION ONE
DEPARTMENT OF SOCIAL AND )
HEALTH SERVICES, )
)
Respondent, )
)
v. )
)
LADONIA RAYFORD, ) UNPUBLISHED OPINION
)
)
Appellant. )
_____ ) FILED: March 7, 2016

SPEARMAN, C.J. — LaDonia Rayford appeals an order terminating her parental

rights to her son, L.R. She contends the Department of Social and Health Services

(Department) failed to prove several statutory prerequisites to termination. We affirm.

## Pretrial History

LaDonia is the biological mother of a son, L.R., born on March 26, 2010.

In April 2012, Child Protective Services (CPS) received a report of LaDonia walking

some distance ahead of two-year-old L.R. as he walked next to a busy street.

In June 2012, the Department began providing LaDonia with family services,

including services relating to her parenting skills and L.R.'s safety and supervision.

On August 10, 2012, the Department received a CPS referral indicating that L.R. had arrived at daycare with rotten food in his diaper bag. At LaDonia's residence, CPS and law enforcement personnel observed medications within L.R.'s reach and saw L.R. holding one of her insulin syringes. They immediately removed L.R. from the home.

Shortly thereafter, the Department learned that L.R. had significant hearing and speech disorders that LaDonia had not recognized. The disorders, which resulted in significant developmental delays, were subsequently corrected with surgeries.

In September 2012, the court entered an agreed order of dependency.[1] The agreed factual bases for dependency included L.R.'s developmental delays and special needs, LaDonia's neglect regarding L.R.'s safety and nutritional and medical needs, and concerns about LaDonia's cognitive functioning.[2] The dependency order required LaDonia to engage in mental health counseling, medication management, parent coaching, and a neuropsychological evaluation.

In April 2013, Dr. Tatayana Shepel completed a neuropsychological evaluation of LaDonia. Dr. Shepel observed impairment or low functioning in LaDonia's verbal and visual attention, verbal problem solving, visual perception, fine motor skills, and the ability to understand and follow verbal instructions. LaDonia showed moderate to severe impairment on tasks requiring both visual and verbal attention, visual problem solving, and memory function. Because of these deficits, Dr. Shepel believed LaDonia "may

---

[1] A dependency order as to L.R.'s father was entered in February 2013. On July 11, 2014, the court terminated the father's parental rights.

[2] Exhibit (Ex.) 1.

2

have difficulty understanding and following new instructions and in situations where there are high demands of her concentration, she may have more problems functioning and have difficulty thinking things through before doing them." Ex. 20 at 6. She also could "have difficulties scheduling activities" and "making decisions." Id. Dr. Shepel testified that it is likely she will "need more time to learn new material and will be slower in gaining new skills." Id. at 7.

LaDonia's responses to a personality assessment suggested she has "significant thinking and concentration problems, accompanied by prominent hostility, resentment, and suspiciousness." Id. She also "may have limited social skills, with particular difficulty in interpreting the normal nuances of interpersonal behavior that provide the meaning to personal relationships." Id. at 8. Dr. Shepel concluded that, based on the personality assessment profile, "Ms. Rayford is not a fit parent for her son; the stress of parenting further exacerbates Ms. Rayford's personal, cognitive, and mental health deficits. " Id. at 12.

Dr. Shepel diagnosed LaDonia with schizoaffective disorder, learning disorder, and an inattentive form of attention deficit disorder. She concluded LaDonia suffers from "chronic mental illness and personality traits" that require ongoing mental health counseling and psychiatric services. Ex. 20 at 14. Dr. Shepel stated that, "[a]t this time reunification of [L.R.] . . . is not recommended given Ms. Rayford's mental and emotional instability, deficient decision-making and executive function, the severity and chronicity of impairments in adaptive functioning, and high risk for abuse and neglect." Id. at 14. Shepel recommended several services, including behavior therapy and a life

3

skills coach. She emphasized, however, that LaDonia's prognosis for "becoming a safe and fit parent for [L.R.] is poor." Id. at 13.

In March, 2014, the Department filed a petition to terminate LaDonia's parental rights. Trial was originally set to begin in August 2014 but was repeatedly continued for various reasons, including LaDonia's need for time to complete parent coaching services. Trial commenced in June, 2015.[3]

### Trial Testimony

Mental health counselor Carmela Martin testified that she was LaDonia's parenting coach from December 2013 through February 2014. Martin testified that LaDonia made significant improvement during that period. She stated in a report that LaDonia "has the ability to effectively parent her son." Ex. 24 at 5. But she also recommended additional coaching and testified that LaDonia was not yet ready for unsupervised visits.

In an April 24, 2015 report to LaDonia's caseworker, Lisa Sibrava, Martin stated:

> [C]ognitive delays may or may not negatively affect her ability to parent. This information can be best provided by a psychologist or psychiatrist treating Ms. Rayford. In terms of her abilities to recognize threats to her son's safety, she may still need instruction/intervention as she has admitted that her own mental and emotional status can sometimes affect her parenting.[4]

Martin's "biggest concern" at that time was whether LaDonia could provide for L.R.'s basic needs, such as clothing, food, housing, electricity, medical care, and educational

---

[3] In its final continuance order, the trial court stated, "unless mother is doing very well in new service, it is extremely unlikely this case will be continued again." Clerk's Papers (CP) at 167.

[4] Ex. 28 at 2.

care. Id. She stated that while LaDonia "demonstrates a willingness to search for stable employment, housing, and medical care, it remains questionable as to whether or not she will be able to provide for herself and still maintain the ability to see to it that [L.R.] will receive all of his necessary services." Id.

Martin provided LaDonia with a second round of parent coaching and life skills instruction beginning in March 2015. Martin did not know why it took over a year to start the second referral. She testified that LaDonia completed only nine and a half of the twelve hours provided in the second referral. Martin believed this was due, in part, to LaDonia's health and family matters she needed to attend to.

Martin testified that LaDonia has a strong bond with L.R. and made significant strides in her parenting skills. But Martin still had safety concerns involving LaDonia's medications being in plain sight on a kitchen island. Also, LaDonia's issues with depression and anxiety seemed to be worse during the second referral. When asked if LaDonia was ready to reunify with L.R. in 2015, Martin said she "didn't believe so at the time." Verbatim Report of Proceedings (VRP) (6/30/15) at 191. Martin did think LaDonia could parent with accommodations, such as in-home help with life skills and house management. On cross-examination, Martin conceded that she was not aware of any program "that comes into somebody's home all day every day for six months and helps out . . . ." VRP at 210-11.

Lisa Sibrava, LaDonia's caseworker since the spring of 2014, testified that she knew of an in-home program similar to what Martin envisioned, but that program was only available for imminent reunifications (i.e., within two weeks). Sibrava knew of no

5

similar service available to parents who were not within weeks of reunification. She stated she would not refer a parent for such services if the parent had not yet reached the level of unsupervised visits.

Sibrava testified that LaDonia had received drug testing, chemical dependency treatment, mental health counseling, parent coaching, a neuropsychological evaluation, and dialectical behavioral therapy. Sibrava attempted to obtain services for day-to-day acts of living through the Division of Developmental Disability Administration. Those services could have included "everything from assisted living to housing supports to twice-a-week check-ins [.]" VRP at 246. But the services were available only if there was ample evidence that LaDonia had suffered developmental delays since her childhood. Unfortunately, LaDonia "couldn't remember where, what State, who, where she went to school, what doctor she saw, what medication she took. And without that evidence, we couldn't move forward." VRP at 246. Sibrava also testified that LaDonia failed to follow through with referrals for occupational supports and assistance with medication management. And while her visits with L.R. went well, LaDonia lost several visitation contracts due to missed visits. Sibrava explained that if a parent misses three visits without giving 24-hour notice, the contract is cancelled.

Sibrava doubted that LaDonia could care for L.R.'s daily needs, stating in part:

> We have a child with special needs and a mom who has pretty significant limitations. Would [L.R.]'s educational services be addressed? Because he has exceptional educational needs. Will his medical issues get addressed safely and quickly? Will she be able to identify risk? Will she be able to not only manage identifying risk to a typical five-year-old but to specifically her son who has exceptional need for supervision and care and medical assistance? Housing has

6

> been an issue. She was able to obtain housing, but then was told that she was going to lose it. She now has a short period of time where she has HEN -- this is the Housing & Essential Needs Program -- back in place, but it's temporary, and she has no real . . . plan of what's going to happen when she loses her housing again that I'm aware of.
>
> Her lights were recently turned off, her electricity. She reported to me that her brother was able to pay for that to get it [sic] back on, but there's still money that's owed. All of the typical things that you have to do to be able to support a child, she's expressed having a lot of difficulty doing those things.[5]

LaDonia told Sibrava "on multiple occasions that she would love it if she could have [L.R.] return home, but that the current foster parents would still be her support system and help her to parent despite [Sibrava] explaining to her that that's not . . . really an option." VRP at 252.

Sibrava testified that there had been no rush to judgment in LaDonia's termination. She noted that the original trial date had been continued for about a year in order to give LaDonia "time to continue to try to do all of the services that the psych eval had recommended, to give her the opportunity to complete everything that she needed to . . . be able to say she's really had the chance." VRP at 242. When asked if six more months of services would change LaDonia's fitness to parent, Sibrava said:

> I think that in this situation there is not a service that's available that's going to remedy the limitations that this mother has. It's not for her lack of desire or her lack of effort or her connection with her child, it's just due to the limitations that are organic, that we can't fix with a service. VRP at 256.

---

[5] RP 249-50.

7

Sibrava testified that L.R. "would be at risk" if returned to LaDonia's care. She had not seen significant improvement in LaDonia's ability to meet L.R.'s needs:

> [S]he's struggling to just get through these services that she has to do over such a long period of time with different people assisting her . . . , she's not been able to do that, then to add the stress of 24-hour parenting and all of the things that come along with a child with special needs, that's really concerning because he's going to have a lot of appointments, especially starting school. VRP at 268

Sibrava conceded that there had been a six-month gap between the two parent coaching referrals and explained that the delay was due to difficulty getting funding.

Sibrava testified that L.R. is adoptable and needs permanence and stability. And because of his hearing, speech, and learning issues, he also needs more than usual supervision and academic support. Although it was a difficult decision, she believed that termination was in L.R.'s best interest.

Hope Drummond, a program manager at Alliance of People with Disabilities (APD), testified that APD provides services, including independent living skills training, for people with disabilities. Drummond testified that LaDonia had requested in-home assistance, and that APD would need to refer her request to another provider. Drummond, however, was unaware of any agency that could provide the daily, in-home assistance at public expense. While Drummond at one point suggested that APD might be able to provide the in-home services without a referral, she was unsure whether APD had "the right qualification, the right certification, and if we need to be certified then we need to know that . . . ." VRP at 332.

8

Drew Duplantis, a health care manager for Downtown Emergency Service Center (DESC), testified that LaDonia was referred to DESC for a weekly mental health group in September 2014. LaDonia did not complete the program and stopped attending in February 2015. Duplantis testified that LaDonia made no progress in her treatment plan. She failed to appear for appointments with a DESC psychiatrist and a follow up appointment with an employment specialist. Duplantis testified that there had been four months of group meetings available since LaDonia stopped attending them.

Philip Rourke, the court appointed special advocate assigned to L.R., testified that he attended some of LaDonia's visits with L.R. and that she clearly benefitted from her parenting classes. Like other witnesses who observed the two together, Rourke testified that LaDonia and L.R. had a strong, affectionate bond. Rourke, however, did not believe it was in L.R.'s best interest to give LaDonia another six months to participate in services. He testified that L.R. is bonded with his foster family and has prospects for adoption. He had not seen as much progress from LaDonia in recent months and doubted that another six months would make any difference. When asked about LaDonia's request for another six months to a year of in-home services, Rourke said that he knew of no such services and that, in any event, the requested services were mainly assistance with concrete household "tasks that are still [going to be] there at the end of the [services]." VRP at 136.

Rourke reluctantly recommended termination, stating:

> [S]he has, I think, put a lot into trying to improve her parenting skills. She's a delightful person and she has a great relationship with her son. And in the current framework, they're doing very well together. I just

9

have questions about whether it would be possible for that relationship to continue with the same quality if she were a full-time mom.

. . .

[W] have heard about her health problems, which I think are continuing and significant, that make some days really hard days to get up and be active. She had some difficulties maintaining her home to the condition that she'd like it to be. And she has continuing mental health issues that are only partially addressed.

. . .

I'm thinking about in particular the problem with depression that she mentioned for which she's being medicated but has not pursued other modes of therapy, and I think pretty clearly continues to suffer from that problem.

. . .

I just think for somebody in her condition right now with her experience that it is asking a lot to be a full-time parent, to take care of an active young person and to work through the issues that she has at the same time. And I think that sometimes it's hard for her -- it would be hard for her to keep her attention on what [L.R.] needs as much as she would want to.

. . .

I think she's in a better position to keep him safe today than she was two and a half years ago, but I'm still concerned and reflect some of the concerns that Dr. Shepel stated in her report.

. . .

I think it's perhaps as much as anything attention to the detail of childcare, of knowing where he is and what he's doing at almost any given point in time, which I think at his age is less necessary than at two, but it's still necessary.

. . .

I think I have some concerns about his safety. I have some concerns about attending to his continuing needs on a regular, ongoing basis. I have no concerns about her wish to do so, but I'm not yet convinced that she's ready to have her full time and attention available for [L.R.].

. . .

[F]or me the ultimate in this situation is an open adoption, and I believe that [L.R.] has a really excellent relationship both with his mother and with his foster parents and that we really should recognize that this child has three parents right at the moment and that we need to be creative and come up with a way for that to continue.[6]

LaDonia testified that she had taken steps, including using a biohazard box, to see that L.R. did not have access to her insulin syringes. She conceded she had missed some visits and lost some visitation contracts. She testified, however, that there had been no more problems since she moved closer to L.R. She also conceded that she stopped going to mental health counseling but claimed that was due to a lack of insurance coverage. The court did not find this explanation credible.

LaDonia also testified that she recently started counseling again and was attempting to get in-home assistance from several sources. She believed she needed "six months to a year" of in-home services before she would be ready to care for L.R. full time. VRP at 44. She envisioned the service providing assistance with furniture, clothes, toys, groceries and laundry.

---

[6] VRP at 125-29.

The court granted the petition for termination and entered the following pertinent findings of fact and conclusions of law:[7]

2.5 The dispositional order provided for the mother to cooperate with the establishment of paternity, complete a neuropsychological evaluation and follow any recommendations, participate in mental health counseling and medication management and participate in parent coaching.

2.6 All services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided.

2.7 The mother has been referred in person and in writing to various agencies for
mental health counseling and medication management services.

2.8 Although available and offered, the mother has not engaged in medication
management through Community Psychiatric Clinic or the Downtown Emergency Service Center (DESC).

2.9 The mother has engaged in some sessions of Dialectical Behavior Therapy (DBT) at DESC. She stopped attending this treatment on February 20, 2015 and although DESC has attempted to contact her and DCFS Social Worker Lisa Sibrava has spoken to her and informed her to continue, she has not done so.

2.10 The court does not find the mother's testimony that she was terminated from CPC or DESC because of insurance problems to be credible.

2.11 DCFS has arranged for and the mother has participated in one on one Parent Coaching from Carmela Martin. This service has benefitted the mother who was able to improve her parenting skills significantly. A second round of parenting coaching, aimed to address her life skills was started but not completed by the mother. It was started in March of 2015,

---

[7] On appeal, LaDonia challenges findings of fact 2.13, 2.15, 2.16, 2.20, 2.24, 2.27-2.29, 2.31, 2.32 and conclusions of law 3.2 and 3.3.

the last day of service was April 23. The mother completed 9.5 hours of the 15 hours that had been authorized.

2.12 Ms. Martin has indicated that the mother has difficulty managing her day-to-day life and activities. She further states in terms of long-term investment in [L.R.]'s emotional development, the mother would need more intervention in order to continue to understand how to best provide for [L.R.]. In terms of her abilities to recognize threats to her son's safety, she still needs instruction / intervention as she has admitted that her own mental and emotional status can sometimes affect her parenting. For example, during the second referral, Ms. Martin discussed with the mother, at least twice, the need to keep medication in a lock-box and not on the counter. A lock box had been provided to Ms. Martin prior to the filing of the dependency process by the Family Preservation worker. Nonetheless, the mother, by the end of the service, had not corrected this problem.

2.13 Ms. Martin does not believe the mother is able to parent independently and would not yet recommend unsupervised visits. She does believe that the mother and [L.R.] have a loving bond.

2.14 The mother believes she needs at least 6 months of working with either a Family Preservation Service (FPS) specialist or an "in-home" person who would help her with "cleaning, laundry and staying organized" before she would be in a position to parent [L.R.] on her own. The mother believes she would need this person to come daily and spend the day assisting her.

2.15 There is no evidence that a service of an "in-home" person, such as that described by the mother is available in this community at public expense.

2.16 The mother has worked with the Alliance of People with Disabilities since 2009, but that agency has not assessed her for disabilities nor visited the mother in her home. To date they have not provided in-home services. It is unclear to the court whether, in fact, this agency simply refers clients to appropriate services in the community or provides the services directly.

2.17 From the initial Department involvement with the mother, social workers and service providers expressed concerns about the mother's cognitive functioning and seeming inability to process and retain information. In order to address this, the mother was referred to Dr.

13

Tatyana Shepel for a neuropsychological evaluation in November 2012. This evaluation was completed April 20, 2013. Testing results found significant neuropsychological deficits that might prevent her from learning, retaining and applying new skills. Dr. Shepel noted that the mother's test results show similarity to someone with frontal lobe system dysfunction, meaning she has difficulty with self-monitoring, concept formation and cognitive flexibility. She struggles with tracking of information, sequencing steps and responding appropriately to changes in her environment. The mother's decision making is impaired and she fails to see the consequences of her choices. Dr. Shepel diagnosed the mother with schizoaffective disorder based upon her paranoid delusions, transient auditory hallucinations, hyper vigilance, social isolation and inappropriate social interactions. In addition, she noted the mother has a learning disorder and ADHD (per history).

2.18 Dr. Shepel made recommendations for services for the mother to increase her own safety and stability, including:
 • Her level of overall neurocognitive abilities suggests she will need a supervised living environment.
 • Services should be offered in one on one format when possible.
 • She has chronic mental illnesses and personality traits that need to be monitored and addressed in ongoing therapy and psychiatric services.
 • Ongoing case management assistance with mental health services, housing and medical care.
 • DBT group therapy to learn methods to control impulsive behavior *and* abstain from self-damaging behaviors.
 • Random UAs
 • Life Skills coach to help with organizational skills, budgeting, task management, and home chores.
 • Domestic violence program to develop safe boundaries.

2.19 Reunification was not recommended by Dr. Shepel based upon "the chronicity and the severity of Ms. Rayford's overall neurocognitive, mental health, personal, social, and occupational impairments." Dr. Shepel noted she is not a fit parent and "the stress of parenting further exacerbates Ms. Rayford's personal, cognitive and mental health deficits." Dr. Shepel noted the mother struggles with taking care of her own needs and she most likely will not be able to take care of some basic needs of her son.

2.20 Although the mother requested a second neuro-psych evaluation, there is no basis for finding that such service would be necessary or appropriate. She has not completed the individual counseling, medication management and DBT services recommended in the first evaluation, so there is no reason

14

to believe a second evaluation would lead to a different result, particularly given the nature and long-term existence of her issues.

2.21 In late 2013, the mother agreed to engage in urinalysis testing. She was referred to Sterling Reference Labs. The mother completed this service successfully. There is no reason to believe the mother has a current substance abuse issue.

2.22 Throughout the Department's involvement with this family, assigned social workers have met with and provided the mother with numerous verbal and written service referrals to providers for mental health assessment and treatment, domestic violence victim advocacy, drug and alcohol evaluation, urinalysis testing, parenting classes and housing resources. The mother has also been provided with transportation assistance including bus tickets and an Orca card.

2.23 After removal from his mother's care, [L.R.] had several evaluations for his hearing and speech. The Department arranged for [L.R.] to have necessary medical procedures including a surgery for ear tube placement and another to address his ankyloglossia (being tongue tied). Both conditions greatly interfered with [L.R.]'s speech development. The mother was unaware of any concerns. He had been fitted with hearing aids, but recent testing has shown that his hearing has improved to the near normal levels and he no longer uses the hearing aids. [L.R.] receives ongoing speech therapy. He remains behind same-age peers; however, he is rapidly increasing his speech and language skills with continued services and consistent care at home.

2.24 [L.R.] has been out of the mother's care for over two and a half years. Although she made some progress during the first part of the dependency, she has plateaued and made no real progress in over a year. The mother's chronic and severe cognitive deficits and mental health concerns make it difficult for her to take care of her own basic needs. She is unable to protect [L.R.] and keep him safe.

2.25 Although the court recognizes that it takes extraordinary effort for the mother to attend visits (three buses to get to the visitation and four to get home), it is of concern to the court that the mother has lost at least three visitation contracts because of missed visits. Her visits in the past few months had been much more consistent, however, the contract was again recently cancelled because of missed visits. Even acknowledging that the mother has health and family concerns that are challenging, it is *very* significant that she could not make visitations with [L.R.] a higher

priority. The mother gave inconsistent explanations for her recent visitation problems.

2.26 DGFS has attempted to tailor offered services to accommodate Ms. Rayford's specific deficiencies and delays, including the services contained in the disposition order and those recommended by Dr. Shepel

2.27 There is little likelihood that conditions will be remedied so that the child can be returned to the mother in the near future.

2.28 Continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

2.29 [L.R.] is both adoptable and has prospects for adoption. He would be at risk if placed in the mother's care at this time.
. . .
2.31 The child's mother is unfit to parent this child.

2.32 Termination of the parent-child relationship between the child and the mother is in the child's best interest, even recognizing the close bond that exists between the mother and [L.R.]. [L.R.]'s need for permanency cannot be achieved without termination, and this need far outweighs consideration of their existing bond.
. . .

III. Conclusions of Law
. . .
3.2 Termination of the parent-child relationship between the above-named minor child and the mother is in the child's best interest.

3.3 The foregoing findings of fact and the allegations of RCW 13.34.180 and .190 have been proven by clear, cogent and convincing evidence unless otherwise noted.

LaDonia appeals.

DECISION

Parental rights are a fundamental liberty interest protected by the United States

Constitution. <u>Santosky v. Kramer</u>, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L .Ed. 2d 599

(1982). To terminate parental rights, the State must satisfy a two-step test. First, it must prove the following statutory elements by clear, cogent, and convincing evidence[8]:

> (a) That the child has been found to be a dependent child;
>
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
>
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
>
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
>
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . .;
>
> (f) That the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1). If the trial court finds that the State has met its burden under RCW 13.34.180, it may terminate parental rights if it also finds by a preponderance of the evidence that termination is in the "best interests" of the child. RCW 13.38.040(2). On review, unchallenged findings of fact are considered verities. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001). Challenged findings will be upheld "[i]f there is substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing . . . ." In re the Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980).

---

[8] "Clear, cogent and convincing" means highly probable. In re Welfare of M.R.H., 145 Wn.App. 10, 24, 188 P.3d 510 (2008).

LaDonia contends the Department failed to prove elements (e) and (f) above by clear, cogent, and convincing evidence. We disagree.

Likelihood That Conditions Will Be Remedied in the Near Future

RCW 13.34.180(1)(e) requires the Department to prove that "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." LaDonia contends the Department did not satisfy this requirement. Relying primarily on the testimony of Carmela Martin, LaDonia argues that her parenting "had improved significantly," that such improvement undermined "the court's adoption of Dr. Shepel's generally poor prognosis for improvement," and that she "could eventually parent full-time, provided that certain accommodations were in place." Brief of Appellant at 16-17. These arguments ignore the rule that this court defers to the trier of fact on matters involving conflicting testimony, credibility, and the weight or persuasiveness of the evidence.[9] They also ignore important portions of Martin's testimony and the court's findings.

While Martin did testify, and the court found, that parent coaching improved LaDonia's parenting skills "significantly,"[10] there was evidence that most of the improvement occurred during the first of two coaching referrals and that her improvement had plateaued. More importantly, parenting skills were just one of several deficiencies undermining LaDonia's parental fitness. For example, Martin herself

---

[9] State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

[10] Finding of fact 2.11. CP at 252-53.

recognized the importance of LaDonia's cognitive difficulties, noting that they "may or may not negatively affect her ability to parent" and that "[t]his information can be best provided by a psychologist or psychiatrist." Ex. at 28. That information was, in fact, provided by Dr. Shepel and adopted by the court in the unchallenged findings.

As previously noted, Dr. Shepel concluded that LaDonia's "decision making is impaired," that "she fails to see the consequences of her choices," and that she suffers from "schizoaffective disorder based upon her paranoid delusions, transient auditory hallucinations, hyper vigilance, social isolation and inappropriate social interactions." Ex. at 20. Dr. Shepel further concluded that LaDonia could not parent L.R. given "the chronicity and the severity of Ms. Rayford's overall neurocognitive, mental health, personal, social, and occupational impairments." Dr. Shepel noted that LaDonia "struggles with taking care of her own needs and she most likely will not be able to take care of some basic needs of her son." CP at 253-54.

In addition, Martin testified that LaDonia's issues with depression and anxiety seemed to worsen during the second referral for parent coaching. And despite noting LaDonia's improvement with parenting skills, even Martin did not think she was ready to reunify with L.R. While Martin thought she could parent L.R. with accommodations such as in-home help, she did not indicate when or whether LaDonia would be able to parent without such accommodations. Nor did she know of a service that could provide the in-home accommodations LaDonia required.

Even assuming LaDonia could improve and eventually parent L.R. without accommodations, she fails to address the court's finding under RCW 13.34.180(1)(e)

19

that there is little likelihood her conditions "will be remedied . . . in the near future." (Emphasis added). Findings of fact 2.27, CP at 253-54. RCW 13.34.180(1)(e) is concerned with the correction, not just the improvement, of parental deficiencies, and the correction must occur "in the near future." In re Dependency of D.A., 124 Wn. App. 644, 656, 102 P.3d 847 (2004). What constitutes "'the near future'" depends on the child's age and placement circumstances. In re Welfare of C.B., 134 Wn.App. 942, 954, 143 P.3d 846 (2006) (quoting In re T.L.G., 126 Wn. App. 181, 108 P.3d 156 (2005)).The "near future" is a short period of time for a child, like L.R., who is in foster care and in need of a permanent placement. Id.; See In re Dependency of T.R., 108 Wn. App. 149, 164-66, 29 P.3d 1275 (2001) (one year is well beyond the foreseeable or near future for six-year-old child). Thus, "what is perhaps eventually possible for the parent must yield to the child's present need for stability and permanence." T.R., 108 Wn. App. at 166.

LaDonia points to nothing in the record demonstrating that she could remedy her parental deficiencies in L.R.'s near future. In fact, there is clear and convincing evidence to the contrary. LaDonia's caseworker and Dr. Shepel regarded her cognitive deficits as organic and essentially irremediable. The CASA also did not believe additional services would remedy LaDonia's deficiencies in the near future. The fact that LaDonia still did not have unsupervised visitation despite three years of services strongly indicated that any future progress toward reunification would be extremely slow. In short, LaDonia's chronic cognitive deficits and mental health concerns,[11]

---

[11] Findings of Fact 2.24, CP at 255.

together with L.R.'s special needs, young age, and adoptability support the court's finding that LaDonia's parental deficiencies could not be remedied in the near future.[12]

<u>Diminishing Prospects for Early Integration Into a Permanent Home</u>

LaDonia next contends the Department failed to prove "[t]hat the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home" as required by RCW 13.34.180(1)(f). Subsection (f) is chiefly concerned "with the continued effect of the *legal* relationship between parent and child, as an obstacle to adoption; it is especially a concern where children have potential adoption resources." <u>In re Dependency of A.C.</u>, 123 Wn. App. 244, 250, 98 P.3d 89 (2004). The subsection also emphasizes a limited time frame for establishing permanency for a child by use of the phrase "early integration" into a stable and permanent home. Here, clear and convincing evidence supports the court's findings that L.R. has prospects for adoption, that he needs permanency, and that his prospects for early integration into a permanent home are diminished by continuing the parent/child relationship.

---

[12] <u>In re Welfare of C.B.</u>, 134 Wn.App. 942, 953, 143 P.3d 846 (2006), cited by LaDonia, is distinguishable. In <u>C.B.</u>, the mother, whose primary deficiency related to drug use, completed her chemical dependency programs and presented evidence from her counselors and friends that her prognosis was good and that she was a different person. Even the State conceded that the mother had completed all drug treatment programs, and the trial court found that she "would likely improve." Her only outstanding service was anger management, which she was scheduled to begin shortly after the termination hearing. She would be completely done with services in four months. The appellate court reversed an order terminating the mother's rights, holding that the Department failed to prove there was little likelihood her conditions could not be remedied in the near future. The record in this case is substantially different. LaDonia had not completed all services at the time of termination, had plateaued after initial progress with parenting skills, suffered from severe and chronic cognitive deficiencies, had ongoing mental health concerns, had not achieved unsupervised visitation, and had a school age child with special needs.

Finally, LaDonia contends the Department did not carry its burden under RCW 13.34.190 of proving by a preponderance of the evidence that termination was in L.R.'s best interest. In re Welfare of S.V.B., 75 Wn. App. 762, 775-76, 880 P.2d 80 (1994) (best interest element must be proven by a preponderance of the evidence). LaDonia contends the State failed to carry its burden because it failed to satisfy RCW 13.34.180(1)(e) and (f). But as discussed above, we conclude the Department carried its burden under RCW 13.34.180(1). LaDonia also points out that "the CASA was hesitant to recommend termination based on the loving relationship between Rayford and her son." Br. of Appellant at 19. But while termination was clearly a difficult decision for all concerned, the consensus, which included the CASA, was that termination was in L.R.'s best interest. The Department carried its burden.

Affirmed.

Spearman, C.J.

WE CONCUR:

Cox, J.

22