IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| In the Matter of the Parental Rights to<br><br>D.C.-C.,<br><br>               Minor Child. | No. 81521-1-I<br><br>ORDER CHANGING CASE TITLE, WITHDRAWING OPINION, SUBSTITUTING OPINION, AND RECALLING MANDATE |

The Supreme Court of Washington granted discretionary review of the opinion filed on June 14, 2021 and on October 6, 2021, remanded the case with instructions to change the case title consistent with In re the Welfare of K.D., 198 Wn.2d 67, 491 P.3d 154 (2021). This court has considered the order and on its own motion, that a majority of the panel has determined that the mandate should be recalled, the names of the parents should be removed from the opinion, the opinion should be withdrawn, and a substitute opinion filed; now, therefore, it is hereby

ORDERED that the clerk shall reinstate this appeal; and it is further

ORDERED that the opinion filed on June 14, 2021 is withdrawn; and it is further

ORDERED that the case title shall be changed consistent with K.D.; and it is further

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Parental Rights to<br><br>D.C.-C.,<br><br>                      Minor Child. | No. 81521-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — J.C. appeals the termination of her parental rights to her son, D.C.-C. She argues that the Department of Children, Youth and Families (Department)[1] did not carry its burden to prove it provided her with necessary services or its additional burden under the federal and state Indian Child Welfare Acts, ICWA[2] and WICWA.[3] The Mother also contends the Department failed to prove that termination was in D.C.-C.'s best interests and the trial court violated separation of powers when it entered an order in the related dependency proceeding directing the Department to file a termination petition. We hold that

---

[1] On July 1, 2018, the newly created Department of Children, Youth and Families (DCYF) took over child welfare duties that were formerly the responsibility of the Department of Social and Health Services (DSHS). RCW 43.216.906. Accordingly, in this opinion, "Department" means DSHS before July 1, 2018, and DCYF on and after July 1, 2018.

[2] Indian Child Welfare Act, 25 U.S.C. § 1901 et seq.

[3] Washington State Indian Child Welfare Act, chapter 13.38 RCW.

Citations and pin cites are based on the Westlaw online version of the cited material.

the unchallenged findings and substantial evidence support termination and the order entered in the dependency proceeding is not properly before us for review. Accordingly, we affirm.

FACTS

D.C.-C., an Indian child,[4] was born in March 2015 and was nearly five years old at the time of trial. D.C.-C.'s alleged Father is, a member of the Nooksack Indian Tribe who also has lineage through the Upper Skagit Tribe. The Mother has no known tribal affiliation.

The Mother has a lengthy history of substance abuse and repeated criminal involvement and instability. She began using drugs and alcohol at the age of 12 and considers herself an addict. Her "drug of choice" is opiates, including heroin, and she began using opiates regularly in her early 20s.[5] The Mother has two daughters who are older than D.C.-C. and who reside with her Mother. According to the Mother, there was at one time an open dependency or custody case involving her daughters, but that case was closed when her Mother took custody.

On September 29, 2015, when D.C.-C. was six months old, the Department filed a dependency petition, and D.C.-C. was placed in out-of-home care the same day. According to the petition, the dependency arose out of a July 2015 referral reporting that the Mother was using drugs and selling them out of

---

[4] D.C.-C. qualifies as an "Indian child" under ICWA, 25 U.S.C. § 1903(4), because he is an enrolled member of the Upper Skagit Tribe and is a member of the Nooksack Indian Tribe.

[5] The Mother was 30 years old at the time of trial.

her apartment. In December 2015, a juvenile court adjudged D.C.-C. dependent as to the Mother, the Father, and any and all putative fathers. The juvenile court found that the mother's parental deficiencies included "substance abuse, mental health, and a lack of age appropriate parenting skills." In its dispositional order, the juvenile court directed the Mother to comply with the following "service requirements":

1.  Participate in substance abuse treatment with a Department-approved provider and follow any recommendations. If a relapse or break from treatment occurs, complete an updated substance abuse evaluation if determined necessary by the substance abuse treatment provider.

2.  Complete random urinalysis [(UA)] testing as arranged by the social worker. Urinalysis testing shall be free of all non-prescribed drugs, alcohol or illegal substances. Any missed or diluted UAs shall be considered positive by the Department.

3.  Participate in mental health assessment with a Department-approved provider and follow any recommendations for further services. Contact the Department to request contact information to self-refer this service by contacting the intake hotline.

4.  Participate in an NCAST[6] assessment and follow any recommendations for further services.

According to the dispositional order, both the Nooksack Tribe and the Upper Skagit Tribe were contacted regarding the dependency and "reported that the child is not eligible for enrollment and they do not consider him to be an Indian Child for their purposes and have declined to be further involved in the Dependency." Nevertheless, beginning in November 2015, the Department consulted with the Local Indian Child Welfare Advisory Committee (LICWAC)

---

[6] Nursing Child Assessment Satellite Training.

regarding the case.[7]

The juvenile court reviewed D.C.-C.'s dependent status nine times over the course of what was ultimately a five-year-long dependency. After its first dependency review hearing in February 2016, the juvenile court found that the Mother was out of compliance with her service requirements and was incarcerated at the Whatcom County Jail. The Mother later testified that she was incarcerated for about 13 months but later released on a DOSA[8] sentence. The Mother achieved a period of sobriety while incarcerated, and in June 2017, after the Mother's release, D.C.-C. was returned to the Mother for a trial in-home placement. The termination trial, which was initially set to begin June 2, 2017, was continued to allow this to occur.

Meanwhile, in a February 2017 dependency review order, the juvenile court entered a finding that "[a] termination petition should be filed" and ordered the Department to file such a petition no later than March 6, 2017. The Department filed a termination petition on February 27, 2017, and the trial court appointed a guardian ad litem (GAL) for D.C.-C.

In November 2017, D.C.-C.'s trial in-home placement ended when the Mother dropped D.C.-C. off with her parents. According to the Mother, she left D.C.-C. with her parents because she did not think she was "necessarily mentally

---

[7] According to later testimony from the guardian ad litem, LICWAC serves as a "stand-in" for tribal Child Protective Teams on cases where "no particular tribe has wanted to be identified."

[8] Drug Offender Sentencing Alternative.

stable" because the Father had gotten into some criminal trouble.[9]  The Mother then relapsed in December 2017, and according to the GAL's later testimony, the Mother "sort of disappeared for a couple of months" and remained in "relapse mode" until about June 2018, when she was involved in a serious car accident. The trial court continued the termination trial again due to the mother's accident and because around that time, the Nooksack Tribe intervened in the termination proceeding, declaring that D.C.-C. was an Indian child.  The Mother would remain hospitalized or in a physical rehabilitation center until October 2018 and was later charged with driving under the influence in relation to the June 2018 accident.

Meanwhile, in June 2018, D.C.-C. was removed from his grandmother's home after she failed a home study and was placed with the mother's family friends.  However, that placement ended in early 2019, after the family friend reported that she was unable to manage D.C.-C.'s behaviors and that they were beginning to interrupt her work schedule because D.C.-C.'s daycare also was unable to manage his behaviors.  D.C.-C. was then placed with a cousin of the Father.  That placement lasted only a month because of D.C.-C.'s behavioral expressions.  Specifically, the cousin later testified that D.C.-C. "would have fits that would last an hour or even more" and "in some cases he'd kick my walls and punch and hit."  She testified that she came to the decision to request a different placement for D.C.-C. because she had a baby who required a lot of attention,

_____

[9] The Father would later be incarcerated and would remain incarcerated through the time of the termination trial.  The Father voluntarily relinquished his parental rights at trial, and he is not a party to this appeal.

and she thought a placement that could give D.C.-C. more attention would be better for him.

D.C.-C. was then placed in licensed foster care, but that placement ended in July 2019 because the foster, according to a social worker's later testimony, "also reported that [D.C.-C.] had significant behavioral expressions that they could not manage." D.C.-C. was then placed with relatives identified by the Nooksack Tribe, with whom the Department was exploring a potential guardianship. But that placement ended in September 2019, when the relatives asked that D.C.-C. be removed from their care due to his significant behavioral expressions. D.C.-C. then returned to cousin's home where he remained through the time of the termination trial.

In all, D.C.-C. was in 10 different placements during the dependency, and had behavior problems in every placement change since being removed from the mother's home following the failed trial in-home placement. But having been in a stable placement with the cousin since September 2019, D.C.-C.'s behavior problems were stabilizing, and his tantrums had decreased in duration from 30 minutes or more to a few minutes.

In the meantime, the Mother maintained a period of sobriety while hospitalized and in rehabilitation after her June 2018 car accident. The GAL later testified that after the Mother's release from physical rehabilitation, the Mother completed a chemical dependency evaluation and began intensive outpatient (IOP) treatment toward the end of 2018. And according to a dependency review order from January 8, 2019, the Mother submitted a clean UA in November and

was "compliant with IOP." But the GAL also testified that "by February [the Mother] was missing more and more appointments" and the treatment facility was "calling her noncompliant." The Mother later testified that she relapsed on heroin in February or March of 2019. According to a May 2019 dependency review order, the substance abuse treatment facility submitted non-compliance reports for January, February, and March, and the Mother was a no-show for a number of UAs in January through April.

Meanwhile, in October 2018, Department social worker Thrisa Phillips Jimmy was assigned to D.C.-C.'s case. Phillips Jimmy works for the Department's ICWA unit, and she testified she had received specialized training in working with Native American children. Additionally, Phillips Jimmy is an enrolled member of the Nooksack Tribe. She testified she was familiar with the Nooksack Tribe's prevailing social and cultural standards, and she used that knowledge in working on D.C.-C.'s case. According to Phillips Jimmy's testimony, though the Mother had been attending visitation with D.C.-C. on a regular basis since October 2018, the Mother began showing up late or not showing up at all to visitations in March of 2019. Phillips Jimmy testified further that in her opinion, D.C.-C.'s behavioral expressions were tied to his visitations with the Mother "being either sporadic or nonexistent." She pointed out that D.C.-C. would sometimes be picked up in advance of visitation, "so he, in his mind he is thinking he's going to be completing a visit and when it doesn't take place, it's very difficult for a child to process." In July 2019, the juvenile court ordered the Mother to call to confirm visits in advance and to show up one hour

7

beforehand. Phillips Jimmy explained that this was so that "instead of having [D.C.-C.] come to the office or to another location and not have mom there, . . . she would have to show up first so we know for sure she is going to be there for the visit." Later, in September 2019, the juvenile court suspended visitation altogether until D.C.-C. could engage in services with a mental health provider with the provider's recommendations to be followed before visitation would be allowed to resume.

In late October 2019, just a few months before the termination trial was set to begin, the Mother went to Catholic Community Services (CCS) for a chemical dependency assessment. Linda Heeringa, the substance use disorder professional who completed the assessment, later testified that the Mother stated she wanted long-term inpatient treatment. According to Heeringa, the Mother reported that she was using heroin and methamphetamine daily. Heeringa diagnosed the Mother with "a severe op[i]oid substance use disorder, a severe stimulant dependence, other stimulant dependence, and a mild other psychoactive substance abuse." Heeringa recommended long-term inpatient treatment, and she sent the Mother's assessment to an inpatient treatment facility. Although the reasons are not clear from the record, the Mother ultimately did not attend long-term inpatient treatment. The Mother later testified that she was waiting for a bed date but had not received any phone calls or messages.

The termination trial began on February 4, 2020. A few days before trial, the Nooksack Tribe notified the trial court that, pursuant to a 2011 tribal resolution in which the Nooksack Tribal Council resolved not to support

involuntary terminations of parental rights in dependencies, it did not support involuntary termination in D.C.-C.'s case. The Nooksack Tribe indicated that it would not be actively participating in the termination trial but that it supported the cousin's home as a long-term placement for D.C.-C. The Upper Skagit Tribe, which had intervened in September 2019 and declared that D.C.-C. was an enrolled tribal member, appeared at trial and supported termination. D.C.-C.'s placement with the cousin, who later testified she was a member of the Upper Skagit Tribe, met ICWA placement preferences, and the cousin was willing to be a permanent placement for D.C.-C.

At trial, the court admitted 16 exhibits and considered the testimony of multiple witnesses, including the Mother, the cousin, Richard England (a qualified ICWA expert), the GAL, Heeringa, and Phillips Jimmy.

On February 13, 2020, the trial court made an oral ruling terminating the Mother's parental rights. It later entered a written termination order that included numerous factual findings. The Mother appeals. We discuss additional facts in the relevant sections below.

DISCUSSION

Termination Order

To terminate parental rights, the Department must satisfy a two-pronged test. In re Dependency of K.N.J., 171 Wn.2d 568, 576, 257 P.3d 522 (2011). First, the Department must prove the six prerequisites to termination enumerated

in RCW 13.34.180(1) by clear, cogent, and convincing evidence.[10]  Id. at 576-77.

Once the Department establishes these statutory prerequisites, the trial court

must then make a finding of current unfitness before parental rights can be

terminated.  In re Parental Rights to K.M.M., 186 Wn.2d 466, 479, 379 P.3d 75

(2016).  This finding need not be explicit; "[s]atisfying all six of the statutory

elements raises an implied finding of parental unfitness."  Id.  If the foregoing

burden is satisfied, termination may be ordered if the Department establishes by

a preponderance of the evidence that termination is in the best interests of the

child.  RCW 13.34.190(1)(b); K.N.J., 171 Wn.2d at 577.

Where, as here, the termination proceedings involve an Indian child,

ICWA and WICWA require the trial court to make two additional determinations.

First, the court must find by clear, cogent, and convincing evidence that the

Department made "active efforts" to help the parent remedy his or her parental

deficiencies.  25 U.S.C. § 1912(d); RCW 13.38.130(1); In re Dependency of

A.M., 106 Wn. App. 123, 130-31, 135, 22 P.3d 828 (2001).  Second, the court

must find that the Department proved beyond a reasonable doubt that the

parent's continued custody of the child is likely to result in "serious emotional or

physical damage to the child."  25 U.S.C. § 1912(f); RCW 13.38.130(3).

On review, we will uphold the trial court's factual findings if they are

supported by substantial evidence.  In re Dependency of P.D., 58 Wn. App. 18,

---

[10] "Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown by the evidence to be 'highly probable.' "  In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (internal quotation marks omitted) (quoting In re Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)).

25, 792 P.2d 159 (1990). "Substantial evidence" means "evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." In re Welfare of T.B., 150 Wn. App. 599, 607, 209 P.3d 497 (2009). We defer to the trial court on issues of conflicting testimony, credibility of the witnesses, and the weight or persuasiveness of the evidence. In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015).

Here, the Mother argues the trial court erred in determining that the Department (1) met its burden to prove it offered and provided necessary services as required under RCW 13.34.180(1)(d); (2) satisfied ICWA and WICWA's active efforts requirement; (3) proved that the Mother's continued custody of D.C.-C. was likely to result in serious emotional or physical damage to D.C.-C.; and (4) proved that termination was in D.C.-C.'s best interests. We discuss each of these determinations in turn.

*A. Necessary Services*

As discussed, to terminate parental rights, the Department must prove six statutory prerequisites to termination. K.N.J., 171 Wn.2d at 576-77. At issue here is RCW 13.34.180(1)(d), which requires the Department to show, in relevant part, that "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." The Mother contends the trial court erred in determining this requirement was satisfied because the Department (1) did not help the Mother obtain stable housing and (2) did not provide her with long-term inpatient substance abuse treatment. We disagree.

First, with regard to housing: A lack of stable housing was not identified by the juvenile court as a parental deficiency. Instead, the only parental deficiencies identified by the court were substance abuse, mental health, and a lack of age appropriate parenting skills. The Mother attempts to draw a causal connection between her alleged housing instability and her substance abuse by pointing out that the dependency petition noted she "was losing her apartment due to drug activity." But the dependency petition notes only that the apartment manager would not be offering the Mother a new lease at the end of the then current lease term; it does not state that the Mother would be without stable housing. Also, the Mother fails to acknowledge that the drug activity referenced in the petition was *her* drug activity. In other words, the Mother's substance abuse precipitated the loss of her apartment, not the other way around.

Furthermore, the Mother misstates the record by asserting the dependency dispositional order required the Mother to "*obtain* 'safe, stable and sober housing.' " (Emphasis added.) Instead, the juvenile court's dependency dispositional order directed the Mother to "*maintain* safe, stable and sober housing." (Emphasis added.) This implies that such housing was available to her. Indeed, the Mother testified at trial that she was living in "a mobility suite behind my momma's house," and argued that the fact that she "has a place to live" weighed against termination. Additionally, Phillips Jimmy testified that she mailed and personally delivered documents to the mother's home. Phillips Jimmy also testified that she and an Upper Skagit tribal social worker had gone to the Mother's home to conduct welfare checks.

12

In short, the record does not support the mother's assertion that housing assistance was a service needed to address a parental deficiency for purposes of reunification. Accordingly, the trial court did not err inasmuch as it did not consider housing assistance a "necessary service" the Department was required to provide under RCW 13.34.180(1)(d). Cf. In re Dependency of A.M.M., 182 Wn. App. 776, 793, 332 P.3d 500 (2014) ("A service is necessary within the meaning of the statute if it is *needed to address a condition that precludes reunification of the parent and child*." (emphasis added)).

The record also does not support the Mother's assertion that the Department failed to satisfy its obligation under RCW 13.34.180(1)(d) by not providing the Mother with long-term inpatient substance abuse treatment.

Specifically, "a parent's unwillingness or inability to make use of the services provided excuses the state from offering extra services that might have been helpful." In re Dependency of Ramquist, 52 Wn. App. 854, 861, 765 P.2d 30 (1988). Here, the Department provided the Mother with intensive outpatient treatment beginning in late 2018, but according to the GAL's testimony, the Mother "had pretty much dropped out of treatment" by February 2019.

Furthermore, RCW 13.34.180(1)(d) "requires the State to prove only that it provided the services that were necessary, available, and capable of correcting parental deficiencies *within the foreseeable future*." In re Dependency of T.R., 108 Wn. App. 149, 164, 29 P.3d 1275 (2001) (emphasis added). To this end, it is undisputed that despite earlier chemical dependency evaluations, the Mother had never been recommended by a chemical dependency counselor to attend

13

long-term inpatient treatment before Heeringa's recommendation in late October 2019. Also, Phillips Jimmy testified that after she learned the Mother had completed an evaluation at CCS, she attempted to obtain a release of information to obtain a copy of the evaluation. However, after leaving releases at the Department's front desk, calling and texting the Mother, sending the Mother Facebook messages, mailing the releases to the Mother, and going to her home with the releases, Phillips Jimmy did not obtain a signed release until January 3, 2020—just a month before trial. Additionally, when asked whether she believed the Mother would be capable of correcting her parental deficiencies if given another three to four months, Phillips Jimmy responded no, explaining,

> If she were to be able to maintain sobriety within the next three to four months, we would still need to be able to observe more extensive amount of time, probably six to nine months, before we could even talk about progression and visits.
> Right now we're not even in a place of visits, so it would be six to nine months before we would even start to talk about progression.

In other words, the record reflects that even if the Mother had begun long-term inpatient treatment as soon as the Department was able to get a release from her in January 2020, that treatment was not capable of correcting the Mother's parental deficiencies within the foreseeable future. Indeed, the trial court made unchallenged findings that "[t]he mother would need to demonstrate continued sobriety and stability for several months before even supervised visitation . . . would be in the child's best interests" and "there is little likelihood, even with perfect compliance and sobriety beginning today, that the mother could correct her parental deficiencies in the child's near future," which the trial court

14

determined was approximately six months.

For the foregoing reasons, the trial court did not err inasmuch as it found the Department satisfied its obligation to provide necessary services to the Mother despite not providing long-term inpatient treatment.

*B. Active Efforts*

Under both ICWA and WICWA, before a parent's rights to an Indian child can be terminated, the Department must "satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d); RCW 13.38.130(1).

WICWA defines "active efforts" as follows:

> In any . . . termination of parental rights proceeding of an Indian child . . . where the department . . . has a statutory or contractual duty to provide services to, or procure services for, the parent . . . , or is providing services to a parent . . . pursuant to a disposition order . . . , the department . . . shall make timely and diligent efforts to provide or procure such services, including engaging the parent or parents or Indian custodian in reasonably available and culturally appropriate preventive, remedial, or rehabilitative services. This shall include those services offered by tribes and Indian organizations whenever possible.

RCW 13.38.040(1)(a).

ICWA does not define "active efforts," but its implementing regulations define "active efforts" as follows:

> Active efforts means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family. Where an agency is involved in the child-custody proceeding, active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan. To the maximum extent possible, active efforts should

15

> be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe. Active efforts are to be tailored to the facts and circumstances of the case.

25 C.F.R. § 23.2.

"Whether the Department has satisfied the 'active efforts' requirement is a mixed question of law and fact." In re Dependency of A.L.K., 196 Wn.2d 686, 697, 478 P.3d 63 (2020). " 'We review the underlying findings for substantial evidence, but review de novo whether those findings satisfy the requirements of ICWA.' " Id. (quoting In re Parental Rights to D.J.S., 12 Wn. App. 2d 1, 37, 456 P.3d 820 (2020)).

Here, the trial court found, beyond a reasonable doubt,[11] that "[a]ctive efforts have been made to prevent the break-up of the Indian family and those efforts have proved unsuccessful." The Mother argues this was error. We disagree.

The trial court's findings relevant to active efforts support its conclusion that the Department satisfied ICWA and WICWA's requirements. First, the trial court made an unchallenged finding that both the Upper Skagit Tribe and the

---

[11] We have held that active efforts need be shown only by clear, cogent, and convincing evidence and not beyond a reasonable doubt. In re Dependency of A.M., 106 Wn. App. 123, 135, 22 P.3d 828 (2001). Nevertheless, the Mother asserts that the higher standard of proof applies. We need not consider this argument because the trial court, which weighed the evidence, actually made its finding beyond a reasonable doubt, and "whether we are dealing with the preponderance of the evidence, the clear, cogent, and convincing evidence, or the beyond a reasonable doubt test, the appropriate standard of appellate review is the substantial evidence test." San Juan County v. Ayer, 24 Wn. App. 852, 860, 604 P.2d 1304 (1979).

Nooksack Tribe were included in staffings and case planning, and LICWAC was utilized prior to formal tribal involvement. The trial court also made an unchallenged finding that the placement with the cousin, who was undisputedly a member of the Upper Skagit Tribe, was the preferred placement of both tribes. Additionally, Phillips Jimmy, D.C.-C.'s assigned social worker, was herself a member of the Nooksack Tribe and testified she used her knowledge of tribal social and cultural standards in working on D.C.-C.'s case. And, the record reflects that the Department involved the tribes in case planning meetings and identifying possible relative placements. See 25 C.F.R. § 23.2(3) (providing, as an example of active efforts, "Identifying, notifying, and inviting representatives of the Indian child's Tribe to participate in providing support and services to the Indian child's family and in family team meetings, permanency planning, and resolution of placement issues.").

Additionally, the trial court made a finding that "[t]he Department identified, offered and provided appropriate services to the parents to reunify the family, including a substance abuse assessment, substance abuse treatment, both inpatient and outpatient, random urinalysis testing to monitor sobriety, an NCAST assessment and parenting instruction and mental health services." The Mother challenges this finding, but it is supported by substantial evidence: The GAL testified that the Mother was "offered referrals for substance abuse treatment and for parenting classes, which she completed." The GAL also testified that the Mother began intensive outpatient substance abuse treatment in late 2018 though she dropped out in early 2019. The GAL testified that the Mother was

offered random UAs. A juvenile court dependency review order from February 2017 confirms that the Mother completed a mental health assessment but no further treatment was recommended, and another order from July 2017 indicates that the Mother was compliant with the NCAST assessment service requirement. Phillips Jimmy testified that the Mother completed parenting instruction in January 2017, before D.C.-C.'s trial in-home placement. In short, and given that the mother's identified parental deficiencies were substance abuse, mental health, and a lack of age appropriate parenting skills, the record supports the trial court's finding that the Department identified, offered, and provided appropriate services to the Mother.[12] See 25 C.F.R. § 23.2(2) (listing, as an example of active efforts, "[i]dentifying appropriate services.").

The record also supports the trial court's challenged finding that "[t]he Department . . . assisted the mother overcoming barriers by assisting with transportation needs including gas and bus vouchers, and driving to the mother's home when necessary to deliver paperwork." Phillips Jimmy testified that she offered the Mother gas cards and bus passes, as well as rides to services and meetings, and the Mother confirmed she was offered gas cards. Phillips Jimmy also testified not only that she would bring releases of information directly to the Mother's home, she also testified she sat down with the Mother several times to go through paperwork and to make sure she understood what the paperwork

---

[12] We agree with the Mother that the trial court's finding that she was provided inpatient treatment during the course of D.C.-C.'s dependency is not supported by substantial evidence. But given that the Mother points to no evidence that inpatient treatment was ever recommended before late October 2019, that defect in the trial court's findings does not affect our analysis.

meant and what the next step was. The record supports the trial court's challenged finding that the Department assisted the Mother in overcoming barriers. See 25 C.F.R. § 23.2(2) (providing, as an example of active efforts, "[H]elping the parents to overcome barriers, including actively assisting the parents in obtaining . . . services.").

Next, the trial court found that Phillips Jimmy "made repeated affirmative, proactive, and thorough efforts to engage the mother via phone, text messages, Facebook messages, written correspondence, frequent meetings involving the tribes and all parties, and in person visits seeking the mother at her last known address." This finding, though challenged, is supported by substantial evidence: Phillips Jimmy testified that she would not only mail out regular service letters, but she would also send the Mother text messages with pictures of referral letters and reminders for meetings, court dates, and visitation. She testified that she would call the Mother on a regular basis, and she also communicated with the Mother on Facebook where she could see an indicator that the Mother had read her messages. Phillips Jimmy also testified that when she was struggling to get in contact with the Mother, she would go to the Mother's home with a social worker from the Upper Skagit Tribe to complete a welfare check. Phillips Jimmy estimated that in all, she had met with the Mother "at least 40, 50 times" since she was assigned to the case in October 2018.

Phillips Jimmy also testified that she had held "shared planning meetings, Family Team Decision Making meetings, as well as several one-on-one meetings" with the Mother and with the tribes. The GAL, too, testified that the

Department had been working with both the Nooksack Tribe and Upper Skagit

Tribe's respective Child Protective Teams.  And as discussed above, Phillips

Jimmy testified that she offered the Mother rides to services and meetings.  The

trial court's finding that Phillips Jimmy made affirmative, proactive, and thorough

efforts to engage the Mother is supported by substantial evidence.  See RCW

13.38.040(1)(a)(iii) (requiring a showing that social workers "actively worked with

the parent . . . to engage them in remedial services and rehabilitation programs

ordered by the court or identified . . . in the service and safety plan beyond simply

providing referrals).

Finally, the trial court made the following findings with regard to Phillips

Jimmy's response to the mother's attempt to enter long-term inpatient treatment

in late 2019:

> Ms. Phillips Jimmy worked to obtain releases from the mother for
> services the mother had accessed on her own, including a
> substance abuse evaluation in October 2019 . . . .  It took until
> January 2020 for the mother to be located to sign a release to allow
> the substance abuse evaluator to share information with the
> Department. . . . The Department made active efforts to
> communicate with CCS and Evergreen Manor regarding the
> mother's ability to comply with treatment. . . . The mother was
> instructed to remain in contact with CCS and Evergreen Manor
> regarding an inpat[i]ent bed date, but did not do so.

The Mother challenges these findings.  Although she is correct that

substantial evidence does not support the specific finding that Phillips Jimmy

communicated directly with Evergreen Manor, the inpatient treatment facility, the

remaining findings are supported by substantial evidence.  Specifically, Phillips

Jimmy testified that during her involvement with the mother's case, her contact

with the Mother would have "periods of in and out," and the Mother would

sometimes report she was either about to start or had already started services but would not sign a release of information when asked. Phillips Jimmy explained that a release was important because without it she was "not able to communicate with the provider to verify that [the Mother] has engaged in that service and that she is making progress in that service."

Phillips Jimmy also testified that when she learned about the Mother's October 2019 substance abuse evaluation, she was not able to promptly get a signed release from the Mother to enable her to communicate with the provider. Phillips Jimmy testified that she "had left releases . . . up at the front desk, . . . called, texted, sent her Facebook messages, . . . mailed her the [releases], and with the Upper Skagit worker . . . went to her home and brought the [releases] with us." But ultimately, Phillips Jimmy did not get a signed release until January 3, 2020. When she did, she called CCS the same day and confirmed the Mother had been recommended for long-term inpatient treatment. Phillips Jimmy testified she then had a conversation with the Mother about next steps:

> So we talked about what facilities she wanted to go to because Evergreen supported a certain prescription that she wanted to have with her so that was her preference. So we discussed following up with CCS and also with Evergreen as well and she indicated to me that they had said that they would be reaching out to her.

Phillips Jimmy testified that she also spoke with CCS, which indicated that Evergreen had been trying to contact the Mother to complete the intake process but had not been able to make contact. Phillips Jimmy testified that she then attempted to reach out to the Mother to relay that information by calling her, texting her, and sending her Facebook messages that Facebook indicated the

21

Mother had seen. In short, and even though Phillips Jimmy may not have reached out to Evergreen directly, the record is clear that she made active efforts to facilitate the Mother's entry into long-term inpatient treatment based on the October 2019 recommendation.

Taken together, the trial court's foregoing findings and the evidence supporting them demonstrate that the Department did much more than take a passive role with regard to preventing the breakup of D.C.-C.'s Indian family. The Department involved the tribes in case planning and placement issues, identified appropriate services, helped the Mother overcome barriers in accessing those services, made proactive efforts to assist the Mother with paperwork, regularly engaged with her throughout the dependency including meeting with her in person and reminding her of upcoming services, meetings, and visitations, and, when the Mother was recommended for long-term inpatient treatment shortly before trial, promptly followed through to get a release from the Mother, discussed facility options with her, reached out to CCS, and attempted to contact the Mother again when the Department learned that the treatment facility had been attempting to reach her. The trial court did not err in concluding that requirements of ICWA and WICWA were met.

The Mother disagrees and contends, as she did with regard to the Department's duty under RCW 13.34.180(1)(d) to provide necessary services, that the trial court erred by determining the Department satisfied the active efforts requirement because the Department did not help the Mother obtain stable housing. But this contention fails for the reasons already discussed. And

22

although the Mother points out in her reply that the dependency court occasionally noted the Mother's non-compliance with the requirement to maintain "safe, stable and sober housing," she points to nothing in the record that suggests housing was ultimately a basis for termination.

The Mother also argues that "when it became clear outpatient treatment was insufficient for [the Mother] to maintain her sobriety, the Department had a duty to identify alternative services to meet [her] needs." But the Mother points to no evidence that it was "clear" that outpatient treatment was insufficient. The Mother stopped *going* to outpatient treatment and, according to the GAL's testimony, "pretty much dropped out." In other words, the fact that the Mother did not become sober with outpatient treatment says less about its efficacy than the Mother's willingness to complete it. This is particularly so because the Mother points to no evidence the Department knew of any barriers to her completing outpatient treatment that the Department failed to address.

Furthermore, the Mother seems to suggest that had Phillips Jimmy done more exploration earlier, the need for long-term inpatient treatment would have become apparent. But this suggestion fails because it is entirely speculative.[13] Indeed, Phillips Jimmy testified that she was not a certified drug and alcohol counselor and was not able to determine the appropriate course of treatment for a person with a drug or alcohol issue. And even though the record reflects that

---

[13] The Mother relies on research studies as evidence of "the efficacy of long-term inpatient treatment for addictions not responding to less supportive modalities, particularly where mental health difficulties exist." But this evidence was not presented to the trial court, and as discussed above, appellate courts do not take evidence.

the Mother had completed a prior substance abuse assessment as recently as November 2018, the Mother testified that the October 2019 evaluation was the first time a chemical dependency counselor had ever recommended long-term inpatient treatment.

The Mother next contends that because Phillips Jimmy did not try to meet with the Mother in person after learning of the recommendation for long-term inpatient treatment, or follow up directly with Evergreen Manor, the Department failed to satisfy the active efforts requirement. But "[w]hen determining whether the State made active but unsuccessful efforts, courts may look to the State's involvement in its entirety." D.J.S., 12 Wn. App. 2d at 32 (citing Bob S. v. State, 400 P.3d at 99, 107 (Alaska 2017)). Additionally, "active efforts" is not the same as "all efforts," or "perfect efforts." See id. ("The State need not exert ideal efforts, but the court should decide if the State crossed the threshold between passive and active efforts.").

Here, as already discussed, Phillips Jimmy acted timely and proactively to obtain releases from the Mother, including trying to meet with her in person after she learned of the October 2019 recommendation, followed up with CCS, and attempted to contact the Mother when she learned Evergreen Manor had been trying to contact her. We are not persuaded that, under the circumstances of this case, Phillips Jimmy was also required to try to meet with the Mother in person or reach out to Evergreen directly—much less that her not doing so means the Department failed to engage in active efforts over the course of its involvement as a whole. Cf. In re Doe, 342 P.3d 632, 639 (Idaho 2015) ("[O]ne or two failures

on the part of [the State] do not entail wholesale failure with respect to the active efforts requirement. This Court must consider whether the State made active efforts to provide remedial services over the course of the proceeding as a whole, despite one or more alleged failings during particular periods.").[14]

Finally, the Mother relies on A.L.K., D.J.S., and In re Welfare of A.L.C., 8 Wn. App. 2d 864, 439 P.3d 694 (2019), in support of her contention that the active efforts requirement was not satisfied. But those cases are readily distinguishable. In A.L.K., "there [was] no indication in the record that the social worker actively made attempts to help [the mother] access any services other than helping with one phone call and a case plan." 196 Wn.2d at 701. Similarly, in A.L.C., the Department "had done little more than provide [the father] with a referral for [a] D[omestic] V[iolence] assessment" despite weeks having passed since the entry of the dispositional order, and "the Department had little, if any,

---

[14] The Mother asserts that additional Department assistance was "critical given her traumatic brain injury." But the trial court did not admit any evidence establishing whether the Mother had a traumatic brain injury. England testified that a traumatic brain injury is "a pretty significant thing" and "can impact a person, how they think." He also testified as to the basis for this opinion, i.e., that the Mother experienced a traumatic brain injury in 2018. But the trial court earlier sustained the parents' objection to the admission of the bases of England's opinions, stating that it would consider them only as such and not as substantive evidence. Cf. Group Health Coop. of Puget Sound, Inc. v. Dep't of Revenue, 106 Wn.2d 391, 722 P.2d 787 (1986) (" '[I]f an expert states the ground upon which his opinion is based, his explanation is not proof of the facts which he says he took into consideration . . . . His explanation merely discloses the basis of his opinion in substantially the same manner as if he had answered a hypothetical question.' " (first alteration in original) (quoting State v. Wineberg, 74 Wn.2d 372, 384, 444 P.2d 787 (1968))). Accordingly, and because England's testimony is the only reference in the record to a traumatic brain injury, the record does not establish the Mother had a traumatic brain injury, much less that the Department was or should have been aware of it.

involvement in the services that [the father] was able to successfully access and complete." 8 Wn. App. 2d at 874-75. Additionally, in A.L.C., the Department was aware the Father was homeless but "the record [was] devoid of any efforts made by the Department to assist [the father] in identifying housing resources." Id. at 875. In D.J.S., the social worker merely met with the Father to discuss services, provided instruction as to how to procure a phone, and referred the Father to a community housing network and mental health provider. 12 Wn. App. 2d at 36. Here, the Department's efforts, discussed above, went well beyond those described in A.L.K., A.L.C., and D.J.S. Accordingly, those cases do not persuade us that the Department failed, in the instant case, to "cross[ ] the threshold between passive and active efforts." D.J.S., 12 Wn. App. 2d at 32.

C. Serious Emotional or Physical Damage

Under ICWA, the Department has the burden to prove "beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). WICWA imposes an identical requirement. See RCW 13.38.130(3). Additionally, under ICWA's implementing regulations, "the evidence must show a causal relationship between the particular conditions in the home and the likelihood that continued custody of the child will result in serious emotional or physical damage to the particular child who is the subject of the child-custody proceeding." 25 C.F.R. § 23.121(c). "Without a causal relationship . . . , evidence that shows only the existence of community or family poverty, isolation, single parenthood, custodian

26

age, crowded or inadequate housing, substance abuse, or nonconforming social behavior does not by itself constitute . . . evidence beyond a reasonable doubt that continued custody is likely to result in serious emotional or physical damage to the child."  25 C.F.R. § 23.121(d).

Here, the trial court found the Department satisfied its burden, stating, "Continued custody of the child by the parents is likely to result in serious emotional damage to the child.  The court makes this finding beyond a reasonable doubt."  The Mother challenges this finding on two grounds: First, she contends reversal is required because the court did not make a specific finding as to the causal relationship between the Mother's home and the risk of harm. Second, she contends that "the Department presented no evidence demonstrating a causal relationship between the particular condition in the mother's home and the likelihood that her continued custody would cause serious emotional or physical damage to her son."

But as to the first contention, the Mother points to no authority for the proposition that the trial court was required to make an express finding as to a causal relationship.  Rather, the regulations require only that the "evidence must show a causal relationship."  25 C.F.R. § 23.121(c).

To this end, and as to the mother's second contention, the evidence does show a causal relationship between the particular conditions in the mother's home and the likelihood that her continued custody would result in serious emotional or physical damage to D.C.-C.  Contrary to the Mother's assertions, the trial court did not base its determination "on bald assertions" that the mother's

27

substance abuse would cause serious damage to D.C-C. Rather, the trial court expressly recognized when it made its oral ruling that the Mother's substance abuse "alone does not establish her inability as a parent." And as the trial court observed, the record reveals not only that the Mother was unable to maintain sobriety but that "when she relapsed the pattern has included her not being available, not being findable, and often missing visitation."

Specifically, the trial court made an unchallenged finding, which is a verity on appeal, that "despite the mother's good intentions, she has not been able to maintain sobriety for any lengthy period of time." Additionally, the GAL testified that when the Mother relapsed in December 2017, she "sort of disappeared for a couple of months" and was not completing regular visitations during that period of time. After maintaining a period of sobriety following her 2018 car accident and release from physical rehabilitation, the Mother, by her own testimony, relapsed again in February or March 2019. The GAL testified that around that time, the Mother became "less compliant with services" and on February 22, 2019, failed to attend a Family Team Decision Making meeting. Similarly, Phillips Jimmy testified that although the Mother had been visiting on a regular basis since October 2018, the Mother began showing up late or not showing up at all to visitations on March 12, 2019. In short, and as the trial court observed, the evidence shows not only that the Mother was prone to relapse but that there was a causal connection between the mother's relapses and her being unavailable to D.C.-C.

The evidence also shows a causal connection between the Mother's

unavailability and substantial emotional harm to D.C.-C. Specifically, and although the Mother challenges the trial court's finding that D.C.-C. had a "heightened need for stability, security and permanence," that finding is supported by substantial evidence. England testified that "with early childhood development and attachment and bonding in particular zero to three and generally zero to five are the most important years for attachment, bonding and development." Accordingly, "[w]hen you have a child who is moved around this many times it is very, very concerning and can be extremely detrimental." England testified that given D.C.-C. was nearing five years old at the time of trial, "I'm, you know, very concerned that he has stability and permanency. . . . As he's getting closer to timing out of that key age group, it's essential that he has the ability to be safe, protected and well cared for at all times. He can not be moved again. I just think that would be absolutely devastating."

Phillips Jimmy testified that D.C.-C. had spent 90 percent of his life in dependency, and had had "multiple disruptions during that timeframe, and experienc[ed] trauma and loss due to that." She testified that the Mother's continued custody would result in emotional damage to D.C.-C. because "when somebody is continuously hurt in the same way . . . it creates a trauma for them that can impede their progress in development as well as any future relationships that they would have, whether that's romantic relationships, professional relationships, or regular friendships."

Similarly, the GAL testified that D.C.-C. had special needs in the form of emotional trauma: "[H]e has behavior that seems out of the norm for a four year

old, tantrums to the extent it has disrupted several placements of him." The GAL testified that D.C.-C. would act out violently when he felt insecure and that consistency was of particular importance for D.C.-C. because it meant "not having surprises that seem to allow him to start to not have the extreme behaviors." To this end, the GAL observed that D.C.-C.'s tantrums got significantly worse after the failure of his trial reunification with the Mother, but his behavior had improved as a result of his consistent, stable placement with the cousin. This causal link between stability and D.C.-C.'s behavior was corroborated by Phillips Jimmy, who testified that based on the case timeline, "I can see that [D.C.-C.'s] behavioral expressions did not start until after the trial return home and then thereafter it's really tied in with [the mother's] visits being either sporadic or nonexistent." It also is corroborated by the cousin, who testified that when D.C.-C. returned to her home in September 2019, he would have tantrums lasting about an hour and consisting of "pull[ing] your hair[,] . . . kicking the walls, punching the walls, throwing anything in his bedroom, pretty much anything he'd just freak out over," but by the time of trial, "his tantrums [were] about five minutes" and "he tells me he's sorry and we kind of talk about it."

In short, and contrary to the mother's contentions, the evidence shows a causal connection between the conditions in the Mother's home—namely, her pattern of relapsing and becoming unavailable—and the likelihood of serious emotional or physical harm to D.C.-C. in the form of a resultant loss in much needed stability. For these reasons, the Mother's challenge to the trial court's

finding that continued custody was likely to result in serious emotional damage to D.C.-C. fails.

*D. Best Interests of the Child*

The Mother next contends that substantial evidence does not support the trial court's finding that termination of her parental rights was in D.C.-C.'s best interests. We disagree.

"Once the court determines that the [State] satisfied its requirements in accordance with RCW 13.34.180(1), parental rights may be terminated if doing so is in the best interests of the child." K.M.M., 186 Wn.2d at 479 (citing RCW 13.34.190(1)(b)). "Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in limbo of foster care for an indefinite period while [the parent] s[eeks] to rehabilitate.' " T.R., 108 Wn. App. at 167 (most alterations in original) (quoting In re Dependency of A.W., 53 Wn. App. 22, 33, 765 P.2d 307 (1988)).

Here, the trial court found that "[t]ermination of the parent-child relationship is in the best interests of the child." Substantial evidence supports this finding. Specifically, the trial court made the following unchallenged findings: (1) "Given the nearly five (5) years of services offered or provided during this dependency, there is little likelihood that the conditions will be remedied"; (2) "The history of this case has demonstrated that despite the mother's good intentions, she has not been able to maintain sobriety for any lengthy period of time"; (3) "At the time of the termination trial, the mother had not yet successfully

maintained sobriety or stability, and was facing additional felony charges and additional prison time"; and (4) "While the mother loves her child very much, there is no reliable indication based upon the history in this case and in the mother's history of parenting that would indicate she is going to be able to make the changes and progress necessary to be able to provide a safe and stable home for the child that will meet his needs."

Additionally, the trial court found that "[t]he mother would need to demonstrate continued sobriety and stability for several months before even supervised visitation between the child and the mother would be in the child's best interests," and "there is little likelihood, even with perfect compliance and sobriety beginning today, that the mother could correct her parental deficiencies in the child's near future."

The foregoing unchallenged findings, which are verities on appeal, demonstrate that the Mother was unable to rehabilitate over a lengthy dependency period. Accordingly, they provide substantial evidence to support the trial court's finding that termination was in D.C.-C.'s best interests.

Separation of Powers

The Mother contends the juvenile court violated separation of powers by entering an order in the dependency proceeding directing the Department to file a termination petition. The Department counters that the order, which was entered in a separate legal proceeding than the termination proceeding from which the Mother appeals, is not before us for review. We agree with the Department.

"[A]n action to permanently terminate parental rights is a new proceeding and not an extension of the dependency action." In re Welfare of S.I., 194 Wn. App. 531, 540, 337 P.3d 1114 (2014). "This is because the purpose of a dependency proceeding and a termination proceeding are diametric: A dependency proceeding seeks to provide services to a parent to correct parental deficiencies so as to reunify the parent-child relationship; whereas a termination proceeding seeks to permanently terminate the parent-child relationship." Id.

Here, the Mother appeals from an order entered in the termination proceeding, and in so doing attempts to collaterally challenge an order entered in the related but distinct dependency proceeding. She contends her collateral challenge is properly before this court because the dependency order is void, and void orders may be attacked at any time. But an order is void only if the court issuing it lacked personal jurisdiction over the party or subject matter jurisdiction over the claim. Rabbage v. Lorella, 5 Wn. App. 2d 289, 298, 426 P.3d 768 (2018). And the Mother does not argue that the juvenile court lacked jurisdiction to enter the challenged order. Cf. K.N.J., 171 Wn.2d at 578 (invalidating dependency order in appeal from termination order where dependency order was void for lack of subject matter jurisdiction). Therefore, the mother's contention fails, and we conclude the challenged order is not properly before us for review.[15]

---

[15] This does not mean the challenged order was not reviewable. Rather, the trial court's order directing the Department to file a termination petition would be reviewable under the discretionary review standards of RAP 2.3. Cf. RAP 2.2(a)(5) (allowing an appeal as of right only from a dispositional decision following a finding of dependency). In any event, even if the Mother's challenge

Affirmed.

_____  Coburn, J.

WE CONCUR:

_____  _____
Dwyer, J.                  Appelwick, J.

---

to the order were properly before us for review, we would reject that challenge on the merits for the reasons set forth in In re Dependency of K.W.D.D., No. 80209-7-I, 2020 WL 3047253, at *4-6 (Wash. Ct. App. June 8, 2020).

ORDERED that the names of the parents be removed from the opinion; and it is further

ORDERED that a substitute unpublished opinion shall be filed.

_Coburn, J._

_Dwyer, J._   _Appelwick, J._